# United States Court of Appeals
### FOR THE EIGHTH CIRCUIT

_____

No. 96-1613

_____

Kelvin Malone,                           *
                                         *
        Plaintiff-Appellant,             *
                                         *  Appeal from the United States
    v.                                   *  District Court for the
                                         *  Eastern District of Missouri.
Daniel Vasquez, Warden, San              *
Quentin State Prison; Jeremiah W.        *
(Jay) Nixon, Missouri Attorney           *
General,                                 *
                                         *
        Defendants-Appellees.

_____

Submitted: May 19, 1997
Filed: February 26, 1998

_____

Before MURPHY and HEANEY, Circuit Judges and ROSENBAUM,[1] District Judge.

_____

MURPHY, Circuit Judge.

Kelvin Malone, who was convicted of murder in Missouri and sentenced to death, appeals from the denial by the district court[2] of his petition for a writ of habeas corpus under 28 U.S.C. §2254. We affirm.

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Jean C. Hamilton, Chief United States District Judge for the Eastern District of Missouri.

Kelvin Malone was convicted of the 1981 murder of William Parr, a 62 year old taxi driver in Berkeley, Missouri, a St. Louis suburb. Richard Elder, a fellow Yellow Cab driver, testified at Malone's trial that around 11:45 p.m. on March 17, 1981, he was waiting in the cab line at the Greyhound Bus Terminal in St. Louis. Parr was first in line, and Elder heard the dispatcher tell Parr to pick up a package at First National Bank for delivery. The bank was less than three blocks from the bus terminal, and such deliveries were top priority. Parr left for the bank immediately. Elder passed the bank about four minutes after Parr left on the delivery run and saw Parr's cab parked in front of the bank with the dome light on.

About a block from the bank at the corner of Sixth and Locust, Elder saw a black man with a suitcase trying to hail a cab. Elder later identified this man as Kelvin Malone. On his way home that night, Elder heard the dispatcher repeatedly calling Parr with no answer. Daniel Ward, a First National Bank employee, testified that he left the bank at 1:00 a.m. and saw a cab parked out front with a black man sitting in the back seat.

Police later found an abandoned cab at 6105 Avila in Berkeley. A local resident reported seeing a Yellow Cab turn onto Avila at around 1:20 a.m. on March 18. Later that morning police found Parr's body in Entrance Park in Berkeley. Parr had been shot and was lying face down with blood coming from his nose and right ear. He was taken to Christian Northeast Hospital where he was pronounced dead on arrival.

There was evidence that Kelvin Malone had arrived in St. Louis from California on the evening of March 17 with a suitcase and two .25 caliber pistols. Around 1:30 a.m. on March 18, Emmanuel Bego, who lived with Michael Crenshaw in Berkeley, heard a knock at the door. Bego heard Crenshaw say "Kelvin" when he went to the door, but Bego did not see who was there. Later that day Crenshaw left for California

with Malone in Crenshaw's car.  After they departed, Bego found a Greyhound bus ticket in the basement for a trip leaving Los Angeles on March 15, with scheduled arrival in St. Louis at 12:40 a.m on March 18.

California police found Malone and Crenshaw asleep in Crenshaw's car in San Jose on March 24 and asked for identification.  The men drove off instead and were apprehended after a high speed chase. The officers found a small suitcase and two loaded .25 caliber pistols in the car.  Three bullets test fired from one of these guns were later compared to a .25 caliber slug taken from Parr's brain.  Initial comparisons with the naked eye by St. Louis police were inconclusive, but an FBI ballistics examiner using a comparison microscope determined that all four bullets came from one of the guns which Malone had carried when he arrived in St. Louis and which were found in the car at his arrest.

Missouri charged Malone with the murder of William Parr.  By the time of the trial on this charge in 1984, Malone had been convicted and sentenced to death in California for two murders that took place in that state just a few days after Parr was killed in Missouri.[3]  Counsel was appointed in the Parr case on November 28, 1983, and Malone directed him to move to trial as quickly as possible; counsel began to meet with Malone about a month before trial commenced on March 26, 1984, and began detailed trial preparation two weeks before trial.  In preparation for trial, counsel reviewed with Malone police reports, his earlier psychological examination, and other types of information.  Malone presented no evidence during the guilt phase of his trial, and the only evidence he presented during the penalty phase was expert testimony by

---

[3]Malone was convicted of the murders of Myrtle Benham and Minnie White.  In the guilt phase of the Benham trial there was also evidence that Malone had kidnaped Leroy Combs at gunpoint in Santa Maria, California on March 11, 1981 and that he and Crenshaw murdered Jim Rankin (who disappeared from a Kansas City parking lot on March 18, 1981).

Professor James Gilsinan that the death penalty is not an effective deterrent. He also offered the testimony of Father Francis Cleary related to historical justifications for the death penalty, but it was not received. Malone directed his attorney not to contact members of his family about mitigating evidence because he wanted to avoid causing them additional pain. Malone was convicted on March 30, and on the next day the jury returned a verdict of death. He chose not to appear at sentencing on April 26, 1984, when he was sentenced to death. He was then returned to California where he remains incarcerated.[4]

Malone's direct appeal of his Missouri conviction was unsuccessful. State v. Malone, 694 S.W.2d 723 (Mo. 1985) (en banc). He then sought state postconviction relief under Missouri Criminal Procedure Rule 27.26. Malone v. State, 747 S.W.2d 695 (Mo.Ct. App. 1988). His original petition was dismissed without prejudice because he was not in Missouri custody at the time it was filed and Rule 27.26 had a custody requirement. He later refiled his petition under Rule 29.15 after it replaced the earlier rule. The new rule did not require Missouri custody, and the trial court rejected the petition on the merits. Malone appealed to the Missouri Supreme Court which remanded for factual findings on whether Malone had complied with the Rule 29.15 requirement that a petitioner verify that the filing contained all his claims and that he understood they were otherwise waived. The trial court was instructed to make findings on whether this verification requirement had been met and on whether the prosecution had exercised racially motivated peremptory challenges. The court found that Malone had not verified his petition and therefore dismissed it for lack of jurisdiction. The Missouri Supreme Court affirmed, Malone v. State, 798 S.W.2d 149 (Mo. 1990) (en banc), and later dismissed as moot Malone's petition to recall the mandate and reinstate his appeal.

---

[4]Counsel stated at oral argument that he understood federal habeas proceedings were pending on Malone's California convictions.

Malone then filed this petition for a writ of habeas corpus. He cited over sixty grounds for relief, some of which had been raised in state court and many of which had not. The district court denied his petition after determining that most of the claims were procedurally barred because Malone had failed to verify his petition as required by Rule 29.15 and had also failed to present many of the claims in state court. After a thorough review of the record, the court also concluded that his claims failed on the merits and later denied Malone's motion to alter or amend the judgment.

## II.

The state argues that not all of Malone's claims are properly before the court because of the content of his notice of appeal. The district court order denying his petition and considering all his claims was issued on December 4, 1995, but the notice of appeal focuses on a January 17, 1996 order denying his motion to alter or amend the judgment. The notice stated that he was appealing, "...from the final order and judgment issued by the Honorable Judge Jean C. Hamilton on January 17, 1996. This judgment and order denied Mr. Malone's habeas corpus claims of constitutional error...." Malone's notice of appeal indicates he intended to appeal both the denial of his post-judgment motion and the district court's rulings on his constitutional claims. It is appropriate in these circumstances to construe his notice of appeal as encompassing both orders. See Sweet v. Delo, 125 F.3d 1144, 1148 (8th Cir. 1997). Because of Malone's apparent intent to appeal both from the judgment denying his petition as well as the subsequent order, we waive the strict requirements of Rule 3(c). See Fed. R. App. P. 2.

Malone wishes to raise many issues on appeal, including various claims of ineffective assistance of counsel. He alleges trial counsel was ineffective in the guilt phase of his trial for failure to call two witnesses who would have testified that they could not identify the black man they had seen in Parr's cab, to call United States District Judge George F. Gunn to testify that he was not harmed during an armed

robbery by Malone, to introduce evidence of a polygraph suggesting that Malone did not commit one of the California murders, to prepare adequately for trial, to obtain a stipulation or testimony that two police officers found initial ballistics comparisons inconclusive, and to object to evidence of a towel used to wipe prints from Parr's cab and to evidence that he gave a false name when arrested, to an improper closing argument, to the exclusion for cause of a potential juror based on his refusal to consider the death penalty, and to several jury instructions. He argues that his trial counsel was ineffective in the penalty phase for not presenting mitigating evidence from his family and not obtaining a new psychiatric examination or using the results of his California exam. Malone argues that appellate counsel was ineffective by not raising on direct appeal every issue raised in his postconviction litigation.

Malone also raises claims of prosecutorial misconduct. He claims the prosecution should not have introduced evidence of his prior convictions or misleading testimony by California prosecutor Gary Admire that Malone had admitted in his California trial that he had been in the vicinity where Parr was killed. He also says the prosecution improperly bolstered the credibility of prosecution witnesses, argued facts not in evidence, and mentioned that he had admitted being near the crime scene, that the jury could act on the basis of personal feelings or the general need to prevent crime, and that he bore the burden of proof.

Malone also presents claims that his right to due process was violated by excuse of a venire member for cause based on his refusal to consider application of the death penalty, by informing the jury of his prior convictions, and by improper instructions on mitigating and aggravating factors. In addition, Malone argues that the prosecutor exercised peremptory challenges based on race in violation of his right to equal protection.

**A.**

-6-

Malone has abandoned several of the claims made to the district court by not presenting them in his appellate brief. Jasperson v. Purolater Courier Corp., 765 F.2d 736, 740-41 (8th Cir. 1985). The abandoned claims include claims that he was denied due process and equal protection by Missouri's delay in bringing him to trial, that he was improperly forced to choose between a speedy trial and sufficient time for his appointed counsel to prepare for trial, that the Rule 29.15 requirement that pro se petitioners verify their postconviction relief petitions violated his rights under the fifth, sixth, and fourteenth amendments, and a claim that the prosecution withheld potentially exculpatory information. Malone has also abandoned several claims of ineffective assistance of trial counsel,[5] claims regarding jury selection,[6] two claims of prosecutorial misconduct based on delay of trial and introducing hypnotically refreshed testimony, and a claim that permitting Gary Admire to repeat Malone's testimony from his California trials violated his right against self incrimination. Other abandoned claims include ineffective assistance by state postconviction counsel, a violation of his right to confront and cross-examine witnesses through the lack of preparation by trial counsel, failure to instruct the jurors on their ability to consider in mitigation all factors of Malone's character, and improper instructions about the burden of proof and the weighing of aggravating factors. The law favors an adversarial presentation of issues in order to conserve judicial resources and to ensure that cases are resolved in the context of an actual dispute. Flast v. Cohen, 392 U.S. 83, 96-97 (1968). The issues

---

[5]These ineffective assistance claims include failure to object to introduction of a Greyhound bus schedule and to an improperly empaneled jury, failure to preserve issues for appeal, and moving to strike venire member Berits for cause. (The latter claim is puzzling since the record shows that defense counsel objected to Berits being removed for cause because of her claim that her employer would not release her from work.)

[6]The abandoned claims regarding jury selection are allegations that the venire panel was not a fair cross section of the community, jurors were improperly excused without cause, a separate jury was not selected for the penalty phase of trial, and the venire panel was not sworn before voir dire.

not presented in Malone's brief should therefore be treated as abandoned and they need not be discussed.[7]  Jasperson, 765 F.2d at 740-41.

## B.

Missouri argues that Malone's constitutional claims may not be reached on the merits because they were not properly presented for review in state court. Several of Malone's claims were never brought in the Missouri courts at all, while others were contained in petitions that did not comply with Missouri Criminal Procedure Rule 29.15 requiring verification.  Malone responds that his claims were properly presented, or alternatively, that any deficiencies in presentation may be excused.

Claims that have not been presented for state court review are defaulted.  Sweet, 125 F.3d at 1149; Nave v. Delo, 62 F.3d 1024, 1030 (8th Cir. 1995).  Malone never sought state court review of thirteen claims of ineffective assistance of trial counsel,[8] seven claims of prosecutorial misconduct,[9] a claim that the trial court was inconsistent

---

[7]We have reviewed these claims nonetheless, and they would fail in any event because of other procedural bars or on the merits.

[8]These claims are that counsel was ineffective by failing to prepare adequately for trial; to investigate state witnesses; to prepare for the cross examination of Gary Admire, to present the results of Malone's polygraph test; to call Judge Gunn; to object to evidence of the false name he gave at arrest, a towel used to wipe prints from Parr's cab, and his prior crimes; to object to the composition of the jury panel or the exclusion of a potential juror based on his opposition to the death penalty or improper closing argument; to use the California psychological report; and to assess independently his mental health.

[9]These claims are that the prosecutor engaged in misconduct by introducing misleading evidence and evidence of Malone's prior crimes and by an improper closing argument (arguing that Malone had the burden of proof, that the jury could act on personal feeling or general desire to enforce the law, arguing facts not in evidence, and bolstering the credibility of state witnesses).

in overseeing the striking of jurors for opposition to the death penalty, a claim that his right to confront and cross-examine witnesses was violated by trial counsel's lack of preparation, four claims of improper jury instruction,[10] and a claim that his death sentence resulted from the use of unconstitutional aggravating circumstances.

The state also contends Malone failed to comply with Missouri Supreme Court Rule 29.15, which requires a petitioner to verify that the petition contains all of his claims and to acknowledge that any not included are waived. The purpose of the rule is to ensure that all claims can be considered in one proceeding so verification is not just a meaningless procedural device. Kilgore v. State, 791 S.W.2d 393, 395 (Mo. 1990) (en banc). The state trial court made a factual finding that Malone had not verified his petition, and the Missouri Supreme Court relied on that finding when it dismissed the petition for lack of jurisdiction. Malone, 798 S.W.2d at 151.

Malone's counsel conceded at oral argument that under "the letter of the law" the claims raised in his state postconviction petition were procedurally barred, but he argues that they should be considered nonetheless. These claims include ineffective assistance of trial counsel,[11] a claim that the prosecution violated his right to equal protection by exercising peremptory jury strikes on the basis of race, that the court

---

[10]Malone claims that the jury was improperly instructed that it must unanimously find particular mitigating factors and not instructed on the limits Missouri imposes on weighing aggravating and mitigating factors and that all elements of the crime and any aggravating factors must be found beyond a reasonable doubt. Malone also alleges his trial counsel was ineffective in failing to object to these errors at trial.

[11]Malone claims counsel erred in his failure to subpoena witnesses who saw a black man in Parr's cab, depose Richard Elder, obtain expert testimony on hypnotically refreshed testimony, contact Crenshaw to testify, obtain stipulations or testimony that initial ballistics tests were inconclusive, call his family to testify in mitigation, and use his existing psychological report or obtain a new one.

made erroneous evidentiary rulings,[12] that Missouri improperly delayed his trial, and that the venire panel was not sworn prior to voir dire.

In order for a state procedural rule to prevent federal review of Malone's constitutional claims it must have been firmly established, regularly followed, and readily ascertainable when it was applied to him. Ford v. Georgia, 498 U.S. 411, 423 (1991). This court has previously held that the verification requirement of Rule 29.15 is an independent and adequate state procedural bar. See Oxford v. Delo, 59 F.3d 741, 745 (8th Cir. 1995). It is an independent state basis for decision because it is neither intertwined with, nor dependent upon, federal law, Ake v. Oklahoma, 470 U.S. 68, 75 (1985), and an adequate basis because it meets the Ford test. At the time Malone's petition was dismissed for failure to comply with Rule 29.15, the Missouri verification rule was firmly established and consistently enforced under the rule and its predecessor. Malone, 798 S.W.2d at 151; see also Mills v. State, 769 S.W.2d 469, 470 (Mo.Ct. App. 1989); Riley v. State, 588 S.W.2d 738, 741 (Mo.Ct. App. 1979); State v. Rector, 547 S.W.2d 525, 526 (Mo.Ct. App. 1977). The rule was readily ascertainable as well. Rule 29.15(d) clearly stated that a "movant shall declare" that all his claims are included and that those not included are waived. Mo. R. Crim. P. 29.15(d). It also referred petitioners to Criminal Procedural Form No. 40, a sample form for a Rule 29.15 petition which included a verification statement with a blank for the petitioner's signature.

The claims included in Malone's unverified state petition may not now be considered on the merits because the bar in Rule 29.15 is an independent, adequate

---

[12]Malone claims that Elder's identification and hypnotically refreshed testimony of another witness should not have been admitted and that he was prevented from soliciting the testimony of Emmanuel Bego about Crenshaw's whereabouts to show that the latter was not available to testify. He claims that evidence of his California death sentence should not have been admitted during the penalty phase and that the testimony of Father Cleary was improperly excluded.

state ground for decision.  Oxford, 59 F.3d at 745.   This panel is bound by that holding unless the court en banc were to reconsider the issue.  Campbell v. Purkett, 957 F.2d 535, 536 (8th Cir. 1992).  The dissent argues that the rule was not clearly established and regularly followed at the time it was applied to Malone, but that argument is not persuasive. Both at the time Malone's unverified petition was filed and at the time it was considered by the state courts Missouri had consistently treated the failure to verify as a jurisdictional defect that prevented consideration of a petition.  See State v. Vinson, 800 S.W.2d 444, 447 (Mo. 1990) (en banc); Malone v. State, 798 S.W.2d at 151; Reynolds v. State, 783 S.W.2d 500 (Mo.Ct. App. 1990); Sheperd v. State, 637 S.W.2d 801, 803 (Mo.Ct. App. 1982); State v. Rector, 547 S.W.2d 525, 526 (Mo.Ct. App. 1977).  All but one of the cases the dissent cites in support of its argument that the rule was unsettled were decided after Malone failed to comply with the verification requirement and after the rule had been applied to him.

The lone case the dissent relies upon that had been decided at the time Malone's petition was considered by the state courts does not help him.  See Rodden v. State, 795 S.W.2d 393 (Mo. 1990) (en banc).  The merits of an unverified petition were considered in Rodden, but in that case involving Rule 27.26 the state had not objected to the lack of verification until an appeal was filed.  Since Rule 27.26 placed no time limit on amendments, an unverified petition could be amended to include verification in the absence of an objection.  Id at 395.  The Rodden court held that such an objection had to be made before the petition reached an appellate court.  Because of the state's failure to make a timely objection in Rodden, the merits had to be reached.  The court expressly distinguished the new Rule 29.15, which placed a time limit on amendments strict limitation on the time to amend a petition in order to comply with the verification requirement and made verification a jurisdictional prerequisite that could be raised at any time. Id.  Failure to verify within the time allowed under Rule 29.15 is treated as a jurisdictional defect barring consideration of the petition no matter when the objection is made.  Id, citing Kilgore, 791 S.W.2d 393 and Reynolds, 783 S.W.2d 916.  Malone failed to comply with this jurisdictional prerequisite by not filing

-11-

a verified Rule 29.15 motion even though verification was a well settled and consistently applied rule at the time. There is therefore no inconsistency between his case and <u>Rodden</u> because they were decided under different rules with different limitations on verification.

The dissent argues that Malone's failure to verify his petition does not amount to procedural default because the fault was that of his postconviction counsel and subsequent Missouri cases required a remand in such circumstances to explore fault, but these cases were not decided until after Malone's petition was rejected. There is no entitlement to postconviction counsel, <u>Coleman v. Thompson</u>, 501 U.S. 722, 755 (1991), and any failure of Malone's counsel to satisfy the requirements of Rule 29.15 is not a basis to excuse the procedural bar. <u>Id</u>.; <u>Nave</u>; 62 F.3d at 1034. In any event, Malone was not prejudiced by the failure to comply with the verification requirement because the state court did consider and reject on the merits all the claims he raised.

Almost all of the claims Malone attempts to assert in his habeas petition have been procedurally defaulted. This includes both those never presented to the state courts, <u>Sweet</u>, 125 F.3d at 1149; <u>Nave</u>, 62 F.3d at 1030; and those which were raised in his unverified postconviction petition. We are bound by the state court's factual finding that Malone failed to comply with the verification requirement of Rule 29.15, 28 U.S.C. § 2254(e)(1), and by our precedent in <u>Oxford</u> that the Missouri verification requirement is a firmly established rule of state procedure that bars consideration of a petition for habeas corpus unless there has been compliance. 59 F.3d at 745.

## C.

Unless Malone can demonstrate cause and prejudice to excuse his default, <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986), or a fundamental miscarriage of justice, <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995), federal habeas review is unavailable because the final state court to review his claims clearly and expressly relied on an independent, adequate procedural rule to dismiss them. <u>Harris v. Reed</u>, 489 U.S. 255,

261 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977).  Malone asserts he can show cause to overcome the default in three ways.  He claims he was unable to comply with Missouri procedure because he was mentally ill, incarcerated in California, and received ineffective assistance from his trial and postconviction counsel.

Establishing cause requires a showing of some external impediment that frustrates a petitioner's ability to comply with the state procedural rule.  <u>Murray</u>, 477 U.S. at 488.  The record in this case includes no evidence that mental illness hindered Malone's ability to consult with counsel, file pleadings, or otherwise comply with Missouri requirements for postconviction relief so mental illness is not cause to excuse his procedural default.  <u>Garrett v. Groose</u>, 99 F.3d 283, 285 (8th Cir. 1995) (conclusive showing of incompetence is necessary).  While being incarcerated in California may have made filing his petition in Missouri slightly more cumbersome, Malone has not shown it interfered with his ability to file.  His California incarceration did not amount to state interference with his access to the courts and is therefore not cause.  <u>See</u> <u>e.g.</u>, <u>Lamp v. State of Iowa</u>, 122 F.3d 1100, 1105 (8th Cir. 1997) (no cause where petitioner's access to court is not blocked); <u>Cf.</u> <u>Amadeo v. Zant</u>, 486 U.S. 214, 220-221 (1988) (deliberately withholding evidence of a plan to exclude black jurors constitutes cause).  Any error by Malone's postconviction counsel could not be cause because there is no constitutional entitlement to post-conviction counsel.  <u>Coleman</u>, 501 U.S. at 755.  Since the alleged errors by his trial counsel did not impede his ability to comply with the verification requirement of Rule 29.15, they also are not cause.  <u>Murray</u>, 477 U.S. at 488; <u>Lamp</u>, 122 F.3d at 1105.

Even if Malone were to show cause to excuse his procedural default, he has not shown actual prejudice.  Any error by Malone's postconviction counsel is irrelevant since there is no entitlement to counsel at that stage.  <u>Coleman</u>, 501 U.S. at 755.  Malone asserts that the ineffectiveness of his trial counsel prejudiced him by the failure to present mitigating evidence or to raise all the issues included in his federal habeas petition.  No duty exists to raise every nonfrivolous issue that is available, however,

<u>Lamp</u>, 122 F.3d 1106, and Malone was not prejudiced by counsel's decision not to raise every conceivable claim. Malone's asserted mental illness and California incarceration did not prejudice him because he has not shown that they interfered with his ability to comply with Rule 29.15 or otherwise seek postconviction relief. <u>Lamp</u>, 122 F.3d at 1105.

Malone also argues that his procedural default should be excused under the fundamental miscarriage of justice exception. To invoke this exception, Malone must demonstrate that new evidence unavailable at the time of trial makes his actual innocence of the crime sufficiently likely to warrant consideration of his procedurally barred claims. <u>Schlup</u>, 513 U.S. at 315. Malone has not presented any such evidence. He merely asserts in his brief that "[c]onstitutional errors, primarily attorney failure to investigate, probably caused his death sentence." This is insufficient to make out a gateway claim of actual innocence under <u>Schlup</u>, let alone the more exacting standard for a substantive claim of actual innocence. <u>Id</u> at 317.

Because Malone has not made a showing of cause and prejudice or actual innocence, the claims presented in his unverified state post-conviction motion are procedurally barred from further review.

**III.**

**A.**

Of the over sixty claims Malone presented in his initial habeas petition and the almost thirty he has pursued on appeal, only his claim of ineffective assistance by appellate counsel is not procedurally barred. Missouri has waived the procedural bar that would otherwise apply to this claim. Malone states that the failure of his appellate counsel to raise on direct appeal all those issues included in his postconviction submissions was below the objective standard of competence for counsel. The district

court dismissed this claim because it was not presented with sufficient argument or facts to support it.

We affirm the district court's disposition of this claim. Claims argued with no specificity are waived. Sweet, 125 F.3d at 1159. A claim of ineffective assistance of counsel requires a showing that deficient performance by counsel prejudiced the defendant by depriving him of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 686 (1984). Malone has cited no specific error by his appellate counsel, nor has he demonstrated that the failure to raise every conceivable claim prejudiced him. Even were we to credit Malone's generalized claim, the failure of appellate counsel to raise all conceivable arguments is not in itself error and the claim would fail on the merits. See Lamp, 122 F.3d at 1106.

**B.**

The dissent concludes at least two of Malone's claims are not procedurally barred and should succeed on the merits. These are claims that the prosecution violated Malone's right to equal protection through racially based peremptory challenges and that he received ineffective assistance of counsel at the sentencing phase by failure to contact his family to testify or to introduce an existing psychological report or obtain a new one. Even if these claims could be considered on the merits, they would fail.

Although Malone made a prima facie Batson claim by establishing that he is black and that the prosecutor engaged in a pattern of striking blacks from the jury, Batson v. Kentucky, 476 U.S. 79, 96 (1986), he failed to rebut the prosecutor's proffered racially neutral reasons for those strikes. Purkett v. Elem, 115 S.Ct. 1769, 1771 (1995). The state trial court considered and rejected this claim three times: on Malone's motion to quash the jury at the conclusion of voir dire, on his motion for a new trial, and on remand from the Missouri Supreme Court. On remand the court specifically found that the prosecutor had race-neutral reasons for his peremptory

strikes and that Malone had not shown those reasons to be pretextual.  Review of this claim is controlled by these factual findings which we must presume to be correct.  28 U.S.C. § 2254(e)(1); Purkett, 115 S.Ct. at 1771-72.  We have also carefully considered the record of the proceeding and agree with the state court's conclusions.[13]

Malone also claims his counsel was ineffective in the sentencing phase of his trial by failing to contact his family about testifying and by failing to obtain a new psychological examination or to introduce an existing psychological report.  Malone specifically told his attorney not to contact family members to avoid causing them more pain.  Malone of course would have been in the best position to know how his family reacted to his troubles with the law, and Missouri rules of professional responsibility provide that attorneys should, "defer to the client regarding such questions as...concern for third parties...."  Mo.R.P.C. 1.1. A professional guideline is a relevant measure to evaluate counsel's performance.  Strickland, 466 U.S. at 688.  Additionally, during Malone's Missouri postconviction proceeding his trial counsel testified that he had talked with Malone's father and sister prior to the Parr trial and that he thought he had spoken with the mother as well.  He also had before him the record of the penalty phase of the California trial which contained family testimony about Malone's upbringing and background, including his violations of the law from an early age.  The decision not to call family members to testify in mitigation has been recognized as a "strategic decision" that is "normally left to counsel's judgment."  Fretwell v. Norris, 1998 WL

---

[13]The prosecutor said venire member Henderson was stricken because she had been the victim of an armed robbery, and none of the white jurors noted by the dissent had personally been the victim of a violent crime.  Venire member Goode was stricken because he seemed familiar to the prosecutor and was the son of a minister.  Although a white venire member who had spent seven years in the seminary was not stricken, he did not have the additional characteristic of being familiar to the prosecutor.  The prosecutor said he struck venire member Simmons because he resided in Berkeley and the prosecutor believed from his experience it was not a good idea to have jurors who were familiar with the area of a crime.

3583, *6 (8th Cir. 1998) (internal citations omitted).  As to the psychological evidence, the record does not indicate that Malone behaved in a manner suggesting the need for a new examination, and his existing report contained potentially damaging evidence relating to his misconduct in San Quentin and his extensive criminal history.

Counsel's decisions thus appear to fall within the range of reasonable representation, Strickland, 466 U.S. at 686; see also Hayes v. Lockhart, 852 F.2d 339, 348 (8th Cir. 1988), but even if we presume his attorney's performance was deficient, Malone has not shown prejudice.  Counsel conceded at oral argument that at least one of the four aggravating factors found by the jury was valid, and this is sufficient to support a death sentence under Missouri law.  State v. Kenley, 693 S.W.2d 79, 82 (Mo. 1985) (en banc).  The facts of the Parr murder suggested a callous indifference to the life of another, and the jury heard evidence that at age twenty Malone had been involved in multiple murders over the course of several days.  When testimony by Malone's family was considered in a hearing on his Rule 29.15 motion, it demonstrated that Malone was involved in criminal activity at a young age and that he had consistently demonstrated anti-social behavior.  His existing psychological report showed that he had pressured other inmates to get their food and had physically threatened guards in jail.  Such evidence of a troubled background and violent behavior is "by no means uniformly helpful." Burger v. Kemp, 483 U.S. 776, 793 (1987).  In light of the whole record any mitigating evidence from family members about his upbringing and psychological difficulties would not have made a different sentence sufficiently likely to support an ineffective assistance of counsel claim. Id at 694.

#### IV.

Kelvin Malone has brought many claims in this habeas  petition, but almost all of them were never properly presented to the state courts, and Malone has not shown he can meet any exception to excuse the procedural bars to consideration of these claims.  His single unbarred claim has not been stated with sufficient specificity to be

-17-

considered.  After thorough consideration of the record, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent.  The all-white jury that convicted Kelvin Malone, a 20-year-old black male with a tenth grade education, was empaneled in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986) (holding that equal protection clause forbids prosecutor to challenge potential jurors solely on account of race).  Moreover, Malone was denied the effective assistance of counsel at the penalty phase of his trial.  Each of these constitutional errors constitutes an independent basis for the issuance of a writ of habeas corpus, and both issues were properly preserved for review by this court.  For these two reasons, I would remand this case to the district court with directions to issue a writ of habeas corpus ordering the state court to vacate Malone's sentence and conviction.  My understanding of the history of this dispute, as well as the controlling law, is somewhat different than that of the majority and is set forth below.

I.

On March 31, 1984, an all-white jury in the Circuit Court of St. Louis County, Missouri found Kelvin Malone guilty of the March 17, 1981 murder of William Parr, a white St. Louis cab driver.  Malone, a black male, was twenty years old on the date of the offense.  He had a tenth-grade education.  On April 1, 1984, the jury recommended a sentence of death for the offense.  After the Missouri court imposed sentence on April 26, 1984, Malone was returned to California, where he remains on death row for a murder he committed in that state.

The trial court appointed William Aylward, St. Louis County Assistant Public Defender, to represent Malone on November 28, 1983.  He did not begin work on Malone's case, however, until about two weeks before the trial was scheduled to start.

Before trial, Aylward talked with Malone on several occasions and reviewed the police records, but he failed to interview any of the witnesses identified in the police reports or by Malone. He did not offer any evidence at trial. The state was represented at the two-day trial by two prosecutors.

At the penalty phase of the trial, the public defender presented no witnesses to humanize Malone or to explain the circumstances of his life leading to his crimes. He called only one witness, an academic who testified that there was no evidence to support the view that the death penalty is an effective deterrent. Malone unsuccessfully appealed his conviction and sentence to the Missouri Supreme Court. State v. Malone, 694 S.W.2d 723 (Mo. 1985) (en banc).

On July 3, 1986, Malone's counsel filed an initial motion for post-conviction relief under Missouri Supreme Court Rule 27.26 (repealed 1988). Following consultation with new appointed counsel, Malone filed an amended Rule 27.26 motion on March 13, 1987. Twenty-two claims were raised in this motion, including claims that the state used its peremptory challenges to strike all blacks from the jury and that Malone's counsel was ineffective at the penalty phase of the trial for failing to investigate or present mitigating evidence. On June 30, 1987, the state filed a motion to dismiss Malone's Rule 27.26 motion; because Malone was in custody in California rather than Missouri, a Rule 27.26 motion did not lie. The district court dismissed the motion with the simple words "so ordered." The Missouri Court of Appeals affirmed, stating that dismissal did not prejudice Malone's right to file a motion under the newly adopted Rule 29.15 so long as he filed on or before June 30, 1988. Malone v. State, 747 S.W.2d 695, 701 (Mo. App. 1988).

On May 24, 1988, Malone's counsel filed a Rule 29.15 motion for post-conviction relief asserting essentially the same claims set forth in his amended Rule 27.26 motion. On July 21, 1988, Malone's counsel filed an amended Rule 29.15 motion incorporating by reference all claims raised in the May 24th motion and stating

additional facts in support of some of the claims. Following a January 12, 1989 evidentiary hearing, the motion court denied each of Malone's claims on the merits.

With respect to Malone's claim under Batson, the motion court stated that Malone was not a member of a racially-cognizable group as required by Batson because his mother was white and his father was black. The court stated that neither Batson nor its progeny had recognized a person of mixed racial heritage as being a member of a racially-cognizable group. As an additional basis of decision, the motion court held that blacks were not intentionally excluded from the jury. In so doing, the court relied on the trial judge's report to the Supreme Court of Missouri that reached the same conclusion. According to the motion court, the findings by the judge who witnessed the entire jury-selection procedure resolved the issue as to whether blacks were excluded from the jury panel in favor of the state and these findings precluded further review of this issue through res judicata.[14]

Malone appealed to the Missouri Supreme Court. During the appeal, the state challenged for the first time Malone's original and amended Rule 29.15 motions as insufficient under Rule 29.15(d) because they were unverified. See Malone v. State, 798 S.W.2d 149, 150 (Mo. 1990) (en banc). The Missouri Supreme Court, stating that it was faced with an incomplete record with respect to the Batson claim and the verification issue with regard to ineffective assistance of counsel, remanded the matter to "the trial court to conduct an evidentiary hearing and determine whether [Malone] complied with the verification provisions of Rule 29.15 and whether [Malone's] trial jury was impaneled contrary to the teachings of Batson v. Kentucky, 476 U.S. 79 (1986) and State v. Antwine, 743 S.W.2d 51 (Mo. banc 1987)." Id.

---

[14]The motion court relied on the report of the trial judge to the Missouri Supreme Court, item E5, to support this finding. For whatever reason, item E5 was not made a part of the record submitted to our court, but we have subsequently obtained a copy of that report and it is properly considered as a part of the record.

On January 19, 1990, the trial court conducted the evidentiary hearing. Prior to the court's ruling, defendant's counsel filed a motion for leave to supply verification for the original and amended motions. The court denied the request. On March 26, 1990, the trial court dismissed Malone's Rule 29.15 motion, ruling on the merits of his Batson challenge, and held that the failure to file a properly-verified motion on or before June 30, 1988 with respect to the remaining issues deprived the court of jurisdiction to hear the matter. The trial court dismissed Malone's motion and the Missouri Supreme Court affirmed. Malone, 798 S.W.2d at 151.

Malone next filed a petition for habeas corpus with the federal district court. In his petition, Malone raised some twenty-three claims including that his trial counsel rendered ineffective assistance at the penalty phase of his trial and that, under Batson, the prosecution improperly struck black jury panel members in violation of his equal protection rights. The district court considered and denied each claim in the motion both on the merits and because Malone did not comply with the state verification requirements.

II.

In Ford v. Georgia, 498 U.S. 411 (1991), the Supreme Court held "that only a 'firmly established and regularly followed state practice' may be interposed by a state to prevent subsequent review by this Court of a federal constitutional claim." Id. at 423-24 (quoting James v. Kentucky, 466 U.S. 341, 348 (1984)) (citation omitted). Here, the verification rule was not firmly established or regularly followed at the time Malone filed his initial Rule 27.26 motion on July 3, 1986, when he filed his amended Rule 27.26 motion on March 18, 1987, when he filed his initial Rule 29.15 motion on May 24, 1988, or when he filed his amended Rule 29.15 motion on July 21, 1988. A brief history of the verification requirement in the Missouri state courts illustrates this fact.

On September 11, 1990, the Missouri Supreme Court considered the post-conviction motion of James Rodden for relief from a murder conviction. <u>Rodden v. State</u>, 795 S.W.2d 393 (Mo. 1990) (en banc). In that case, Rodden filed a pro se Rule 27.26 motion attacking his murder conviction. His motion was neither signed nor verified. Rather, counsel signed it "James Rodden by Lee Nation." The filing, according to Rodden's testimony, was accomplished without his knowledge or consent. On July 21, 1988, Rodden filed a first amended Rule 27.26 motion, which was again signed only by Rodden's counsel. On August 31, 1989, a second amended Rule 27.26 motion was filed. It, too, was neither signed nor verified by Rodden. On the same day, the trial court ruled against Rodden on the merits. The state argued that the Missouri Supreme Court lacked authority to review the decision because of the absence of verification of the post-conviction motion. The Missouri Supreme Court agreed to hear the case on the merits stating:

> Even an essential element of a pleading, like verification, may be added by amendment. <u>Drury Displays, Inc. v. Board of Adjustment</u>, 760 S.W.2d 112, 114-15 (Mo. banc 1988). In this case, the state went to trial on the merits without any objection to deficiencies in the pleadings. The first objection to the pleadings was before this Court on appeal. Any deficiencies in the pleadings were waived, the pleadings are treated as amended to conform with the evidence, and the state may not raise lack of verification of the Rule 27.26 pleading for the first time on appeal.

<u>Id.</u> at 395 (citations omitted). Here, as in <u>Rodden</u>, the lack of verification was raised for the first time on appeal, yet the state court dealt inconsistently with the two cases.

Two months later in <u>State v. Vinson</u>, 800 S.W.2d 444 (Mo. 1990) (en banc), the Missouri Supreme Court again considered jurisdiction over an unverified, amended, Rule 29.15 motion. The court, citing the instant case, <u>Malone</u>, 798 S.W.2d at 150, dismissed the motion for want of jurisdiction. Chief Justice Blackmar dissented, stating:

I cannot agree that the Court lacked jurisdiction to consider the amended 29.15 motion. I would hold, rather, that when the state provides counsel for a postconviction movant, and that counsel fails to procure the movant's verification on an amended motion which is otherwise timely, the Court may allow the verification to be supplied at a later time.

Proceedings under Rule 29.15 are civil. It is uncommon in civil proceedings to hold that the filing of defective papers deprives the Court of jurisdiction. The usual remedy is to permit defects to be corrected by amendment. The law has been particularly intolerant of those who make no mention of a pleading defect until the trial court has ruled and then seek to disadvantage their opponents by claims of procedural defect. Rule 55.33(b). Nothing in the text of Rule 29.15 indicates that proceedings under that rule are to be treated in a way different from what is usual in civil actions. Such phrases as "a nullity," or "failed to invoke the circuit court's jurisdiction" are simply bootstrapping. The Court could perfectly well allow the verification to be supplied when the defect is pointed out. This would allow the state to enjoy all of the real or imagined benefits of verification.

. . . .

Some of the opinions on this subject suggest that the verification requirement serves an expediting purpose. I cannot see that it expedites the proceedings in any way. There rather will be procedural hassles and a ping-pong match between state and federal courts, if this movant is obliged to pursue other postconviction remedies.

Id. at 450-51 (Blackmar, C.J., dissenting).

Six months later, the Missouri Supreme Court decided Sanders v. State, 807 S.W.2d 493 (Mo. 1991) (en banc), and Luleff v. State, 807 S.W.2d 495 (Mo. 1991) (en banc). In Sanders, the movant was convicted of murder in the first degree and sentenced to death. His Rule 29.15 motion for post-conviction relief was denied without an evidentiary hearing. Sanders filed a pro se motion for post-conviction relief

on April 25, 1988. The following day the court appointed the office of the public defender to represent him, and the court granted the public defender's motion for additional time within which to file an amended motion. On November 29, 1988, counsel filed an addendum to the pro se motion that was neither signed nor verified by Sanders. On January 19, 1989, counsel filed a completed pro se Rule 29.15 form that had been signed and verified by Sanders back on May 5, 1988, soon after he filed the pro se motion. The trial court dismissed the amendment as not timely filed. In reversing the district court, the Missouri Supreme Court stated:

> Until today [April 9, 1991] this Court has not deviated from its firm position that failure to timely file a motion constitutes a complete bar to consideration of a movant's claims, even when the claims are attributable entirely to inaction of counsel. . . .
>
> In Luleff v. State, 807 S.W.2d 495 (Mo. banc 1991), decided today, this Court altered course. There the record reflected that movant's appointed counsel took no action whatsoever on movant's behalf, thereby apparently failing to comply with the provisions of Rule 29.15(e). On the face of the record it appeared that movant was deprived of meaningful review of his claims. The question then became one of the appropriate forum in which to address the claims of abandonment of counsel. This Court held the appropriate forum to be the motion court.
>
> The considerations underlying this Court's holding in Luleff are equally compelling in this case where the record reflects that counsel has determined that there is a sound basis for amending the pro se motion but fails timely to file the amended motion as required by Rule 29.15(f). The failure is, in effect, another form of "abandonment" by postconviction counsel.

Id. at 494-95 (original emphasis and citations omitted). The court then laid down explicit guidelines for counsel to follow in future cases.

At such time as counsel may seek leave to file pleadings out of time, the motion shall set forth facts, not conclusions, showing justification for untimeliness. Where insufficiently informed, the court is directed to make independent inquiry as to the cause of the untimely filing. The burden shall be on the movant to demonstrate that the untimeliness is not the result of negligence or intentional conduct of the movant, but is due to counsel's failure to comply with Rule 29.15(f). If the court determines that the untimeliness resulted from negligence or intentional conduct of movant, the court shall not permit the filing. Should the failure to file a timely amended motion result from inattention of counsel, the court shall permit the filing.

Id. at 495 (original emphasis omitted).

The same year, the Missouri Supreme Court considered the first-degree murder conviction of Leamon White. State v. White, 813 S.W.2d 862 (Mo. 1991) (en banc). White filed a timely but unverified post-conviction motion on August 17, 1989. The motion court appointed counsel on September 25, 1989. The first counsel withdrew and a new post-conviction counsel was appointed. New counsel failed to file a timely verified motion. White argued that his second counsel effectively abandoned him by failing to file a timely verified motion. The supreme court stated: "Counsel's withdrawal, failure to file a timely amended motion, and failure to verify and allege sufficient facts raise serious questions as to whether the movant received postconviction representation in the sense of Rule 29.15." Id. at 864 (original emphasis omitted). The court remanded to the motion court for further proceedings consistent with Sanders.

In State v. Clay, 817 S.W.2d 565 (Mo. Ct. App. 1991). David Lee Clay's counsel first raised certain issues in an amended Rule 29.15 motion that was not timely filed nor verified. The court stated:

> If movant can establish that the failure to verify and timely file is caused by the inattention of counsel, the amended motion can be filed and ruled on.
>
>    . . . .
>
> If the failure to verify was Clay's fault, the amended motion is a nullity and the motion court has no jurisdiction. If, however, the untimeliness was counsel's fault, the motion court must treat the 29.15 motion as timely filed. And, if the failure to verify is counsel's fault, the trial court must take appropriate steps to have the amended motion verified so that it properly invokes the jurisdiction of the motion court.

Id. at 569 (citations omitted).

In Hutchinson v. State, 821 S.W.2d 916 (Mo. Ct. App. 1992), the movant filed a pro se Rule 29.15 motion on June 28, 1988, contending that his trial counsel was ineffective. On August 25, 1988, the court appointed counsel, who filed an unverified Rule 29.15 motion on October 28, 1988. In that case:

> An evidentiary hearing was held on January 26, 1990. The motion court stated at the hearing that its review was limited to the claims alleged in the pro se motion. Limited testimony was heard concerning the allegations in the amended motion. The court denied the pro se motion and concluded that because the amended motion was unverified, the claims alleged in the amended motion were "time barred and procedurally waived." . . . .
>
> For his sole point on appeal, movant contends that the trial court erred in not considering the grounds raised in the unverified amended motion and in not inquiring into the cause of the failure of the amended motion to be verified. The general rule is that an unverified motion is a nullity which fails to invoke the jurisdiction of the trial court. However, the Missouri Supreme Court modified the strict application of this rule in State v. White, 813 S.W.2d 862 (Mo. banc 1991). If a movant can

establish that the failure to verify is caused by the inattention of counsel, the amended motion can be filed and ruled on.

> . . . [W]e must remand to the motion court for a determination of the cause of the lack of verification. The motion court must make a factual inquiry into the cause of the violations by holding an evidentiary hearing or, if the facts are undisputed, by examining the record. The court must make findings of fact on the question of whether the failure to verify results from the negligence or intentional conduct of movant or from the inattention of counsel. If the failure to verify was movant's fault, the amended motion is a nullity and the motion court has no jurisdiction. If, however, the untimeliness was counsel's fault, the motion court must take appropriate steps to have the amended motion verified so that it properly invokes the jurisdiction of the motion court. If, as a result of the motion court's findings, the amended motion is filed and verified, the motion court should then proceed to review the allegations of the motion.

Id. at 917-18 (citations omitted).

A careful review of the above-cited cases leads to the conclusion that the state's verification rule was neither firmly established nor regularly followed when the Supreme Court of Missouri affirmed the trial court's dismissal of Malone's Rule 29.15 motion for lack of verification. Although the Missouri Supreme Court regularly used the language of jurisdiction, its decisions belie that posture. Moreover, as noted in Chief Justice Blackmar's dissent in Malone, the majority of the state court ignored Rodden, which had been decided less than one month before. The verification rule was not firmly established when Malone filed his Rule 27.26 motions nor when he filed his initial or amended Rule 29.15 motions on July 3, 1986 and July 21, 1988, respectively.

In any event, failure to file a timely-verified motion was the fault of his appointed counsel, not Malone, which brings Malone within the purview of Vinson, Sanders, Luleff, White, Clay, Hutchinson. Malone was a prisoner in California when counsel was appointed to represent him in the post-conviction proceeding. Counsel should

have been aware of the verification requirements under the rules, yet failed to take timely action to have that requirement fulfilled. With respect to the Rule 29.15 motion, Malone's counsel explained the procedural reasons why Malone had to file a new motion, but did not remember whether she informed him that the new form had to be verified. Malone expected that his counsel would file a proper Rule 29.15 motion on his behalf. Between the time of the filing of the original Rule 29.15 motion and prior to the filing of Malone's amended motion, an attorney reviewed the file and noticed that the initial Rule 29.15 motion had not been verified. He immediately sent a new form to Malone in California. During the week of September 12, 1988, Malone's lawyer found a verified, signed copy of the Rule 29.15 motion, notarized on the 12th day of July, 1988 and postmarked July 25, 1988.

Counsel's failures to verify are not to be treated under the rubric of ineffective assistance of post-conviction counsel, but rather as an abandonment of counsel. The fact that the Missouri Supreme Court in 1991 set forth guidelines for counsel to follow in future cases does not support the state's view that the verification rule was firmly established and regularly followed at the time that Malone's motions were filed. In the cited cases the Missouri Supreme Court remanded to the motion court to determine whether the fault for lack of verification lay with the movant or with the movant's counsel. Here, the record is clear that the fault lay with counsel, not Malone. Thus, in my view, lack of verification does not constitute procedural default under state law in this case.

III.

Defense counsel moved to quash the jury panel at the conclusion of voir dire and for a mistrial post-verdict because the defendant's equal protection rights were violated by the prosecuting attorney's intentional exclusion of all four black members of the jury

panel. Although the prosecutor offered no race-neutral explanation for the strikes at the time of trial,[15] the court nonetheless denied the motions.[16]

Malone raised the <u>Batson</u> issue at trial, in his first amended motion to vacate his sentence under Supreme Court Rule 27.26 dated March 13, 1987, in his Rule 29.15 motion dated May 24, 1988, and in his first amended Rule 29.15 motion filed on July 20, 1988. The Missouri Supreme Court, on appeal of the trial court's denial of

_____

[15]In response to Malone's post-verdict motion to quash the jury and for a new trial, the state responded that Mr. Malone was not black. The state expressed the view that Malone could not challenge the exclusion of black jurors because he was of mixed race, being the child of a white mother and a black father.

[16]A direct appeal in the instant case was still pending, however, at the time <u>Batson</u> was decided. Thus, the <u>Batson</u> test is the appropriate one to apply in this case. At the time of trial, however, the prosecutor's use of peremptory challenges was covered by <u>Swain v. Alabama</u>, 380 U.S. 202 (1965). In <u>Garrett v. Morris</u>, 815 F.2d 509 (8th Cir. 1987), we held that the decision in <u>Swain</u> does not completely insulate a prosecutor's use of peremptory challenges in a given case where the prosecutor volunteers the reasons for his actions and makes them part of the record.

> The record is then no longer limited solely to proof that the prosecutor has used his peremptory challenges to strike all black jurors from the defendant's jury panel, and the presumption that the prosecutor has acted properly falls away. At that point, the court has a duty to satisfy itself that the prosecutor's challenges were based on constitutionally permissible trial-related considerations, and that the proffered reasons are genuine ones, and not merely a pretext for discrimination.

<u>Id.</u> at 511.

Here, the state's response that Malone was not black is not only disputed at every phase of the record, but this statement, as noted in <u>Garrett</u>, required the court to satisfy itself that the challenges were based on constitutionally-permissible, trial-related considerations.

-29-

Malone's Rule 29.15 motion, explicitly remanded the case to the trial court to conduct an evidentiary hearing and determine whether Malone's trial jury was impaneled contrary to the teaching of Batson and Antwine. Malone, 798 S.W.2d at 150.

On remand, the trial court conducted an evidentiary hearing and determined that Malone established a prima facie case under Batson. The trial court found that Malone was black and therefore a member of a cognizable racial group. The court also found that the state utilized three of its nine peremptory strikes to remove blacks from the jury panel and one of its two strikes in the alternate pool to strike a potential black alternate, leaving Malone to be tried by an all-white jury. The court directed the prosecutor to explain his reasons for striking the four black members of the venire: Henderson, Grooms, Simmons, and Goode. For the first time the prosecutor outlined his reasons for making the disputed strikes. He stated he struck Henderson because she was the victim of an armed robbery a few years before in which no person was ever charged with the offense. He stated that he struck Grooms because he stated his objection to the death penalty and because he indicated he would attempt to convince others of his view. The prosecutor defended his strike of Simmons because Simmons resided in Berkeley. Finally, he stated that he struck Goode because he looked familiar and because he was the son of a minister or pastor of a church. The court found that the prosecutor provided credible, rational, neutral explanations for each of the questioned peremptory strikes and that the state's actions were properly based on verbal and nonverbal communications from jurors and on the prosecutor's previous experiences. Finally, the court found that Malone had failed to show that the stated explanations were pretextual. The Missouri Supreme Court affirmed over Chief Justice Blackmar's dissent.

After the Missouri Supreme Court denied relief, Malone raised his Batson claim as part of his petition for habeas relief in federal district court. The court denied relief, holding that Malone had defaulted the claim in light of the state court's dismissal of his Rule 29.15 motion. In the alternative, the district court denied Malone's Batson claims

on the merits. It concluded that the prosecutor's reasons for striking each of the black prospective jurors were racially neutral on their face. The court rejected Malone's argument that the state's proffered reasons for striking Henderson and Goode from the venire panel were pretextual. With respect to venirepersons Grooms and Simmons, the court also concluded that, because Malone made no attempt to persuade the court that the prosecutor's reasons for striking them were pretextual, he was not entitled to habeas relief.

As an initial matter, because the Missouri trial court, the state post-conviction court, and the Missouri Supreme Court have all considered the Batson issue on the merits, the federal habeas court should do the same. In the alternative, assuming the Batson claim was not denied on the merits but because Malone's Rule 29.15 motion was unverified, the claim nonetheless should have been considered by the federal habeas court on the merits because, as discussed previously, the verification requirements were not firmly established or regularly followed when the Missouri Supreme Court decided Malone.

Malone established a prima facie case under Batson. As the state now concedes, Malone is black.[17] Moreover, the prosecutor struck all four blacks who remained on the thirty-four-person jury panel after all other panel members had been either successfully challenged for cause or excused for other reasons.

I next consider whether the government offered race-neutral reasons for peremptorily challenging all four blacks on the thirty-four-person venire from which the jury was selected. "[U]nder Batson, the striking of a single black juror for racial

---

[17]The record overwhelmingly supports this fact of Malone's race. At every point in the trial, he was referred to as a black man. It is difficult to understand the confusion of this question at various points in Malone's state proceedings, such as when the trial court reported that Malone was "an Asiatic-Moorish-American."

-31-

reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." United States v. Battle, 836 F.2d 1084, 1086 (8th Cir. 1987) (citing United States v. Gordon, 817 F.2d 1538, 1541 (11th Cir. 1987); and United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986)).  Thus, a single, improperly-stricken juror constitutes a basis for granting a new trial.

I agree with the district court that the prosecutor stated a race-neutral reason for challenging Kenneth Grooms.  Grooms stated during voir dire that he opposed the death penalty.  Moreover, I find no evidence in the record that the prosecutor's reason for striking Grooms was pretextual.  I note, however, that there is no support in the record for the prosecutor's statement that Grooms indicated he would attempt to convince other jurors of his view.

In contrast, the district court's decision to sustain the state's peremptory challenges to Henderson and Simmons is not fairly supported by the record.  The prosecutor testified at Malone's post-conviction hearing that he struck Kim Henderson because she had been the victim of an armed robbery in 1980 and no one had been charged in the offense.  In this circuit it is well established that a litigant may not justify the peremptory challenges to a venireman of one race unless veniremen of another race with comparable or similar characteristics are also challenged. Davidson v. Harris, 30 F.3d 963, 965 (8th Cir. 1994); Walton v. Caspari, 916 F.2d 1352, 1361-62 (8th Cir. 1990); Garrett v. Morris 815 F.2d 509, 513-14 (8th Cir. 1987).  In other words, Malone can establish that an otherwise neutral explanation is pretextual by showing that the characteristics of a stricken black panel member are shared by white panel members who are not stricken.  According to the voir dire transcript, the prosecutor failed to strike several white panel members who also had been victims of robberies or burglaries in which no one had been charged for the offense.  These included Gerald J. Bush (house broken into in 1977; no one charged), Kenneth G. Hrebec (father's grocery store robbed two or three times over ten years before trial), Janet I. Pettigrew

(home broken into three or four years before trial), and Minnie B. Hopkins (home broken into twice ten years before trial). The prosecutor did not specifically ask Henderson whether the fact that no one had been charged in her case would affect her view of Malone's case. To the contrary, when asked, along with other members of the panel, whether the fact that she or her friends or relatives had been crime victims would prevent her from being a fair and impartial juror in this case, Henderson did not indicate that she would have any problems. Therefore, despite the state's proffer of a race-neutral reason for excluding Henderson from the jury, the record demonstrates that the reason is pretextual. I thus believe it clear that the prosecutor violated <u>Batson</u> and Malone's constitutional rights when he excluded Henderson from the jury.

The prosecutor claimed that he struck Simmons based on his address in Berkeley, that the murder occurred in Berkeley, that Malone had ties to persons in Berkeley, and that some of the trial witnesses were friends of Malone. The district court accepted these reasons as race neutral. The court also stated that Malone failed to argue that the prosecutor's reason was pretextual. I disagree with both conclusions. At voir dire, the prosecutor did not ask Simmons a single question, let alone questions about where he lived, the extent of his ties to the Berkeley area, or whether he was acquainted with any of the potential witnesses. It was not until the post-conviction hearing that the prosecutor advanced the claim that he struck Simmons for the reasons stated above. Yet, he failed at the post-conviction hearing to develop any testimony that could reasonably support his belief that Simmons might be influenced in any way by the fact that he lived in the area where the murder occurred. Moreover, I cannot accept the district court's assertion that Malone is without recourse because he failed to argue that the reason advanced by the prosecutor at the post-conviction hearing was pretextual. That the prosecutor's rationale was entirely ad hoc and unsupported by any statement at voir dire is sufficient to raise the issue of pretextuality. On its face, I do not believe that the prosecutor's reason was race neutral given the concentration of persons of color living in Berkeley. Moreover, even if the proffered reason were considered race neutral, Malone has established that it was pretextual in light of the fact

that Simmons was asked no relevant questions and volunteered no relevant information to support the prosecution's position.

Finally, I am convinced that the district court erred in sustaining the state's peremptory challenge to alternate Goode. The prosecutor stated that he struck Goode because he looked familiar to him and because he was the son of a minister or pastor of a church. Neither reason withstands scrutiny. The colloquy between the prosecutor and Goode was as follows:

MR. McCULLOCH: . . . . Mr. Goode -- I don't know -- while I've been sitting here, you look very familiar to me. Do I look familiar to you? Do you think you know me at all?

VENIREMAN GOODE: Not off hand.

MR. McCULLOCH: You work for the Postal Service?

VENIREMAN GOODE: Right.

MR. McCULLOCH: Are you a letter carrier?

VENIREMAN GOODE: No. A truck driver.

MR. McCULLOCH: Okay. Well, that wouldn't be it. You live in the Ferguson area?

VENIREMAN GOODE: No. Florissant.

MR. McCULLOCH: Florissant?

VENIREMAN GOODE: Um-hum.

MR. McCULLOCH: That could be it, from the Florissant area. In any event, I don't look too familiar to you, do I? You don't think you know me?

VENIREMAN GOODE:  No, I don't.

Id. at 223-24.  Later, Malone's counsel questioned Goode as follows:

> MR. AYLWARD:  Okay.  Mr. Goode, do you attend any church or --
>
> MR. GOODE:  Yes, I do.
>
> MR. AYLWARD:  Do you attend regularly?
>
> MR. GOODE:  Yeah.  My dad, he's a pastor.

Id. at 238.  It is apparent from the colloquy that the prosecutor had little or no basis for his claim of familiarity; and, in any case, the state did not develop the record to suggest how any familiarity might adversely affect Goode's ability to sit on the jury.  As to the second reason, Malone has established that it was pretextual because Gerald J. Bush, the jury foreman, had spent seven years in the ministry and he was not challenged by the prosecutor.[18]

---

[18]In addition, Bush stated that his home had been broken into in 1971 and no one was prosecuted.  Bush revealed the following at voir dire:

> MR. AYLWARD:  Are you affiliated with any religious group?
>
> VENIREMAN BUSH:  To a certain degree, yes.  I spent approximately seven years in the ministry.
>
> MR. AYLWARD:  Do you attend church at this time?
>
> VENIREMAN BUSH:  Yes.
>
> MR. AYLWARD:  And your family as well?
>
> VENIREMAN BUSH:  Yes.

Id. at 137-38.  According to the prosecutor's testimony, a similar incident justified the exclusion of Henderson from the jury.  Thus, the jury foreperson, a white male, possessed two of the traits allegedly deemed unacceptable by the prosecution.

IV.

In both his state and federal habeas corpus petitions Malone claimed that his trial counsel provided ineffective assistance at the penalty phase of his trial by failing to investigate and present mitigating evidence. Specifically, Malone claims that his trial counsel failed to interview or call his family members failed to have Malone psychologically evaluated or present available evidence of Malone's psychological history. Although the district court concluded that Malone's counsel rendered effective assistance, I disagree.

To succeed on his claim of ineffective assistance of counsel, Malone must show (1) that his counsel's performance was professionally unreasonable under all the circumstances, and (2) that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694 (1984). "When a defendant challenges a death sentence[,] . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. Always, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result the defendant challenges. Id. at 696.

In a death penalty case, counsel is obligated to collect as much information as possible about the defendant for use at the penalty phase. Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994). This is so because the sentencing battle must be one between the particularized nature of the crime and the particularized characteristics of the

individual defendant.  <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303 (1976)  (holding unconstitutional a state first-degree-murder statute that carried automatic death sentence); <u>see</u> <u>also</u> <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 112 (1982); <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978).  As the Supreme Court has stated:

> [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of a particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

<u>Woodson</u>, 428 U.S. at 304 (internal citation omitted).

Under all the circumstances, the jury at Malone's trial was given no sense of the person he was.  At the guilt phase of Malone's trial, the jury returned its verdict at 11:00 p.m. on Friday, March 30, 1984.  Despite the late hour and the fact that the next day was Saturday, the penalty phase of the trial began at 9:30 on the morning of March 31.  The entire proceeding--including the jury's deliberation on the appropriate punishment--lasted only four hours.  Malone was not even present during the penalty phase of the trial, having refused to attend.  The only additional evidence submitted by the state were Malone's prior convictions and sentences from California which the prosecutor read to the jury from certified court records.

For its part, the defense presented just one witness:  a professor from St. Louis University who offered his general, expert opinion that the death penalty was not an effective deterrent to crime.  Malone's trial counsel offered no evidence to personalize, or even humanize, Malone in the eyes of the jury.  He did not investigate or present evidence about Malone's family, his upbringing, or his social, educational, psychological, or physical history.  In fact, although trial counsel asked the jury to find

that Malone's age at the time of the offense was a mitigating factor, he never even told the jury how old Malone was.[19]

Testimony developed during the state post-conviction proceedings reveals that Malone's lawyer did nothing to investigate or develop mitigating evidence in preparation for trial. His conversations with Malone were so limited that trial counsel did not even know that Malone had two children. Malone's lawyer failed to speak to either of his parents, both of whom later stated for the record that they would have readily testified on their son's behalf as they did during his two California trials.[20] He did not request a psychological evaluation of his client nor did he review the extensive psychological profiles developed on his client for the California proceedings. According to the record, Aylward made no specific preparations for the penalty phase other than to contact one academic and one religious expert on capital punishment.

The district court accepted the government's argument that counsel's decision not to call family members was a strategic one prompted primarily by Malone's expressed preference not to put his family through the painful process again. Under the first prong of Strickland, a particular decision not to investigate is assessed for reasonableness under the circumstances and a heavy measure of deference applies to counsel's judgments. 466 U.S. at 691. Under the circumstances, however, it was unreasonable for counsel to completely abdicate his duty to investigate and to

---

[19]Malone had just turned twenty years old at the time of the offense. By the time of this Missouri trial, Malone was twenty-three years old and had spent the better part of the preceding three years doing "hard time" at San Quentin Prison. The record also indicates that Malone had a beard at the time of trial. Thus, it would have been unreasonable to expect the jury to intuit that Malone was a young man at the time of the offense based solely on his physical appearance at trial.

[20]Malone's mother testified that, while she knew her son had been moved temporarily from California to Missouri, she was unaware that he was standing trial in Missouri for capital murder until well after his conviction and sentence.

understand the very life he was asking the jury to spare. His performance is readily distinguishable from the examples cited in Strickland as circumstances in which limited or nonexistent investigation might be reasonable:

> [W]hen the facts that support a certain potential line of defense are generally known to counsel because of what defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Id. Malone and his lawyer barely communicated until two weeks prior to trial, at which point counsel focused primarily on preparing for the guilt phase of the trial by reviewing investigative reports prepared by the state. Thus, Malone's lawyer knew very little about what he might find if he investigated Malone's personal history. It follows that, without knowing what information Malone's family could provide the defense, it was unreasonable for counsel to use Malone's reluctance to cause his family pain as a justification for not doing the work involved in developing a picture of Malone's character and history. Without the necessary background information, Malone's counsel was in no position to advise Malone on the importance of the mitigating evidence and on the likelihood that his family's testimony might save his life. It seems clear that counsel's performance during the penalty phase of Malone's trial was unreasonably deficient.

With respect to the second prong of Strickland, Malone suffered prejudice as a result of his counsel's deficient performance. Because Malone had twice stood trial for capital murder in California, his Missouri trial counsel had a wealth of information from which he could have drawn a picture of Malone for the jury. But for counsel's failures, the jury would have learned the following information from his family, friends, educators, and diagnosing psychologists: Malone is a mixed-race son of a white

mother and a black father. He is the third child and oldest boy in a family of seven children. Malone is also the father of two children who were ages one and four at the time of his trial. His father's career in the military until 1971 kept him from the family for long periods during most of Malone's childhood and the family moved often. These frequent relocations interrupted his education and exacerbated his academic and disciplinary problems. Although Malone lived variously in West Point, New York; Fort Court, Texas; Wursbury, Germany; St. Louis, Missouri; and Honolulu, Hawaii, his most consistent childhood home was the city of Seaside, California which suffered intense racial tension during Malone's youth. He was teased constantly for his mixed-race background and had difficulty finding acceptance with either the white community or with the burgeoning black power movement. Malone's small size and frail physical condition also made him a target for constant ridicule. Malone dropped out of school in the tenth grade. His siblings and schoolmates universally described him as unpopular, hyperactive, a loner, and a child who was easily manipulated and bossed around.

Kelvin had several falls and resulting head injuries as a child. Two of them required overnight stays in the hospital, the first when he was approximately eighteen months old and the second when he was about ten years old. Malone's parents attributed many of Malone's academic and social problems to these head injuries. Dr. Craig Rath, a clinical psychologist who testified during the penalty phase of Malone's trial in San Bernardino, California, disagreed. Dr. Rath spent at least nine hours with Malone over several visits while he was detained in California, administered psychological tests, and reviewed approximately sixty-four defense reports based on interviews with persons in Malone's past. Based on that information, Dr. Rath positively diagnosed Malone as having suffered from untreated attention deficit disorder (ADD) as a child and with residual ADD and antisocial personality disorder since adulthood. Dr. Rath explained that in residual type ADD, the hyperactivity that characterizes childhood behavior often goes away but problems with impulsivity, attention span and organizational skills remain. Dr. Rath also determined that, because

Malone's ADD was the result of a small amount of organic brain damage, the roots of his problems are partially nonvolitional. Dr. Rath's diagnosis is corroborated by the less-detailed 1982 report of Dr. William Jones, another licensed clinical psychologist in California. Dr. Williams examined Malone and found that he had a history of head trauma and "weak indications of underlying neurological dysfunction."

While I acknowledge that none of this information about Malone's personal history would have required the jury to find any statutory mitigating circumstance beyond a reasonable doubt, the fundamental fairness of the penalty-phase proceedings must be questioned. See Strickland, 466 U.S. at 696. I am convinced of the reasonable probability that, had the jury been apprised of Malone's history, it would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Id. at 695.

V.

Therefore, I would reverse the district court's denial of habeas corpus relief for two reasons, both of which, for the reasons I have discussed, were properly preserved for our review. First, the jury was impaneled in violation of Batson and the prosecution's intentional, racially-motivated exclusion of all black members of the venire panel violated Malone's equal protection rights. Second, Malone was denied the effective assistance of counsel at the penalty phase of his trial. Each of these constitutional errors constitutes an independent basis for the issuance of a writ of habeas corpus. I have examined each of the other claims of error in Malone's petition and agree with the district court and the majority that none of them justify relief. I would remand the case to the district court with orders to issue a writ of habeas corpus directing the state court to vacate Malone's sentence and conviction.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.