# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 98-2580

_____

| | | |
|---|---|---|
| Gloria S. Carter, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Chrysler Corporation; | * | |
| United Auto Workers, Local 110, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: January 15, 1999
Filed: April 20, 1999

_____

Before BOWMAN, Chief Judge, MURPHY, Circuit Judge, and VIETOR,[1] District
Judge.

_____

MURPHY, Circuit Judge.

Gloria S. Carter, a black woman, sued her employer, Chrysler Corporation, and
her union, United Auto Workers, Local 110, under Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e et seq., and the Missouri Human Rights Act, Mo. Rev.
Stat. § 213.010 et seq., for claims of hostile work environment and retaliation. The

_____

[1]The Honorable Harold D. Vietor, United States District Judge for the
District of Iowa, sitting by designation.

district court granted summary judgment in favor of Chrysler and the union, and Carter appeals. We affirm in part and reverse in part.

## I.

On a motion for summary judgment, the non-movant's evidence is to be taken as true and all justifiable inferences are to be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1377 (8th Cir. 1996). We accordingly recite the background facts in this light except where otherwise noted.

Gloria Carter started to work at Chrysler in 1976, became a member of Local 110 in 1986, and experienced no particular difficulty before May 1992 when she transferred to a different shift in the engine pre-dress line in the chassis department.

About a month after her transfer Carter went to foreman Charlie Wilson to complain that co-worker Joe Krieger had not tightened the bolts on a transmission that had come down the assembly line to her position. When she returned to her station, Norman Dickens, who worked immediately next to her on the line, threw some screws at her, gave her "the finger," and said "Fuck you, bitch!"

This incident was the first in a series of abusive acts that continued for some two years. Dickens called her "bitch" almost every other day, and frequently cursed, whistled, and gave her the finger. He threw bolts and screws into her work area, sometimes hitting her. He painted a red line to separate their work areas and told her not to cross it. He made racial comments such as "keep your black ass down the line, bitch," and referred to her as "black mother-fucking bitch" or just "black bitch." Once she caught him pouring motor oil on her chair and on the floor of her work area. Dickens and another co-worker, Al Rideout, brought Playboy magazines to work and read them during breaks at a table in Carter's line of sight while she worked at her station. Dickens also stared at Carter in a hostile manner and repeatedly erected a cardboard barrier between their stations. When Carter went into Dickens' work area

2

to get floor dry material stored there, he threw the whole bag against the wall, bursting the bag. Dickens told an investigating Chrysler manager that Carter did "crazy things like one day last summer she stood there and took off her bra. Sometimes she stretches out in the rack, wearing tight fitting pants and does exercises putting her ass up in our faces."

Other things happened to Carter that she suspected Dickens, Rideout, and co-worker Ron Beasley had done. At various times she found grease smeared on her safety glasses, trash thrown in her work area, and unwelcome objects placed in her work station, including a dead roach and a photograph of a naked white man. At one point she returned from a break to find her chair smashed. She got a new chair, but Dickens took it into his own work area and sat on it. On at least two occasions, someone smeared catfish bait on a panel in her area, creating a foul odor which disturbed others. Her co-workers told her that there was graffiti in the men's restroom saying "Gloria sucks dick" and you could buy something from Gloria for a hundred dollars.

Sometimes extraneous items came down the line to Carter's station attached to motor parts. On several occasions a glove was placed on an oil dip stick with the middle finger raised. Three signs came down the line which said: "Everybody's picking on me, crybaby bitch," "Suckass [circled and crossed out] the job you elminate [sic] may be your own!" and "Without your pig tail you will never go to heaven you shit sucking bitch."[2] At one point she found a dead mouse taped to a motor. When she saw the mouse, Carter screamed and let the motor go by without performing her assigned tasks. She looked over at Dickens and saw him watching for her reaction; he whistled, gave her the finger, and called her "bitch" as the mouse went by.

_____

[2]The union contends that the job elimination and pig tail notes were directed at two male workers involved in a labor dispute. One of these men wore his hair in a ponytail, but Carter was also wearing a ponytail the day the notes went down the line.

Carter complained to supervisors about the harassment from the first day Dickens shouted insults and threw bolts at her. She reported that conduct to her supervisor, Larry Inman. Inman, foreman Wilson, Chrysler labor relations representative Date Carpenter, and shop steward Mike Mullens met with Carter and Dickens. Carpenter told Dickens that he could be fired if he continued acting in such a way, but Dickens cursed Carter and gave her the finger after leaving the meeting. Later that day Carter told Inman and Wilson that Dickens had renewed his abusive conduct, but neither did anything in response.

Over time, Carter complained to a succession of supervisors, including Inman, Ron Harmon, Jim Dupee, Jerry Quinn, and Dee Franks. She made reports about various actions directed at her, including the motor oil, fish bait, dead mouse, and chair-smashing incidents. She estimated that she talked to John Kelley, Chrysler's personnel manager, about such actions at least twenty times between September 1992 and January 1994. Sometimes a supervisor would speak to Dickens about the incidents, but these conversations produced only temporary relief at most. A supervisor told Dickens and Rideout that materials like Playboy could not be read at the plant after Carter complained about their presence in her work area, and the magazines disappeared for a while. Some of the supervisors had direct knowledge of offensive conduct from their own observations of the restroom graffiti or the fish bait, and they occasionally arranged to have her work area cleaned.

Several Chrysler managers appeared dismissive or hostile to her complaints. Supervisor Quinn once said "Here comes trouble" as Carter approached him to speak about a new problem. She went to Clarence Ziegelmeyer, the superintendent of the chassis department to tell him that Dickens had told her to get her "black ass back down the line." Ziegelmeyer took no action and merely shook his head and said, "They're playing games again. Kids are playing games again."

Carter also interacted with union representatives. Mullens, the shop steward, was present at the first meeting with Dickens. Carter later reported other offensive

incidents, including the one in which Dickens took her chair, to Mullens' successor as shop steward, Larry Rehmert. During 1992 she tried to get in touch with Joyce Carson, chair of the union Civil Rights Committee; she was told at least once that Carson did not have time to talk with her. In March 1993 Chrysler contacted Carson, who then became involved in investigating the situation.

Over this period there was a series of meetings as a result of Carter's complaints. She met with company and union officials in September 1992, March 1993, July 1993. The Chrysler personnel included plant labor relations supervisor Ralph Crause, personnel manager Kelley, labor relations representative Michael Stephens, and superintendent Ziegelmeyer. The union officials included Carson and shop steward Rehmert, as well as union committeeman Tony Candela and union chairman Jim Wideman. Chrysler and union officials interviewed Dickens, Rideout, Beasley, and other workers in the area in which Carter worked. The alleged harassers denied wrongdoing, and other employees denied any knowledge of harassment. Dickens and the others were verbally warned that harassing conduct would lead to their dismissal, but no further action was taken when it resumed. When labor relations supervisor Crause suggested to Carter that she transfer to another area, Carter said she was not going to let them "run [her] off." Representatives of the company and union discussed transferring Carter, but union president Don Woemmel said that such transfers had to be in accordance with the collective bargaining agreement and with her consent. No one spoke to Dickens, Rideout, or Beasley about the possibility of transferring one or all of them.

Carter never formally asked the union to file a grievance on her behalf. After the series of meetings in March 1993, the union decided against filing a grievance on Carter's behalf. Candela stated in his affidavit that he asked Carter in July 1993 if there was anything more she wanted the union to do and she told him that she wanted Dickens fired. Candela responded that only the company had that authority and that in his opinion the company did not have enough proof to terminate him.

In December 1993 Chrysler fired Dickens and Randall Duck after the "pig tail" and "suckass" notes went down the line to Carter. This action came after an investigation which indicated that Duck had written the notes, that Dickens had placed them on the line, and that Carter was their intended target. The company terminated Dickens and Duck for violating company rules of conduct prohibiting harassment.[3] Grievances were filed by the union on behalf of both men, and they returned to work the following month. Crause, the labor relations supervisor for Chrysler, testified that neither he nor personnel manager Kelley had expected the discharges to be permanent because both employees "had considerable seniority" and the evidence against them was circumstantial. He admitted, however, that he thought Dickens had sexually harassed Carter.

Carter filed her first discrimination charge with the Equal Employment Opportunity Commission in August of 1993, claiming that she had been racially and sexually harassed by a co-worker and that Chrysler had failed to take corrective action. On February 9, 1994, shortly after Dickens' return to work, Carter submitted a second charge to the EEOC repeating her allegations of harassment and also asserting that she had been threatened with dismissal for her complaints. Carter also filed a charge against the union at this time, claiming that it had sexually and racially discriminated against her by failing to pursue grievances on her behalf and by warning her against further complaints.

Carter received right to sue notices from the EEOC and the Missouri Commission on Human Rights and timely filed this suit on July 14, 1995. Her complaint alleged that her co-workers created a hostile work environment because of her sex and race, that she complained to both her supervisors and union officials, and that they failed to take effective remedial action. She also claimed that her co-

---

[3]Standard 8 prohibited "[h]arassing any person based on that person's sex, race, religion, age, handicap, national origin or membership in another protected class," and Standard 14 prohibited "[t]hreatening, intimidating, coercing or using abusive language to others."

6

workers retaliated with additional harassment when she complained and that she was told that continued complaints would result in her termination.

Chrysler and the union each filed a motion for summary judgment. The district court dismissed both the hostile work environment and retaliation claims against the union, but it construed Chrysler's motion as one for partial summary judgment on the hostile work environment claims and dismissed only those claims against the company. Chrysler then brought another motion for summary judgment on the retaliation claims asserted against it, and they were also dismissed.

Carter filed notices of appeal which included all of these rulings.[4] She has not briefed any issues relating to the dismissal of the retaliation claims so we deem that part of her appeal abandoned. See Fed. R. App. P. 28(a)(4); Malone v. Vasquez, 138 F.3d 711, 716 (8th Cir.), cert. denied, 119 S. Ct. 384 (1998); Jasperson v. Purolator Courier Corp., 765 F.2d 736, 740 (8th Cir. 1985). We therefore need not address the background or merits of the retaliation claims, but we note that the allegations about threats of termination were never fully developed in the record.

In ruling on the motions, the district court decided that only a few comments and acts of co-workers could be construed as racially or sexually based, that they were too isolated to support liability, and that the hostile conduct directed at Carter

---

[4]Carter also argues that the district court abused its discretion by denying her motion to file an affidavit after the court's final summary judgment order had been issued. The purpose of the affidavit was to authenticate transcripts of taped conversations Carter had had with representatives of Chrysler and the union about her complaints. The tapes included statements showing knowledge of her situation, such as the statement of a Chrysler official that several people had corroborated her complaints but were unwilling to do so in a formal investigation, and the remedial steps that had been considered. We cannot say the district court abused its discretion by denying Carter's untimely motion to file the affidavit, coming as it did after summary judgment had been ordered, but she may choose to renew her motion on remand.

was motivated by her "snitching" rather than her race or sex. The court did not go on to consider whether Chrysler had taken appropriate remedial action in response to Carter's complaints. As to the union, the court concluded that it did not have a duty to provide a harassment-free work environment and that Carter had not presented a claim for breach of the duty of fair representation. The court summarily dismissed the retaliation claims against the union on the basis that Carter had failed to make a prima facie case of retaliation. In its memorandum dismissing the retaliation claims against the company, the court stated that Carter had failed to show that any harassment resulted from her complaints about the conduct directed at her. The court never addressed the alleged threats of termination in ruling on the retaliation claims which in any event have not been pursued by Carter on her appeal.

## II.

Summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the facts need to be taken in favor of the non-movant, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1377 (8th Cir. 1996). We review a grant of summary judgment de novo. See Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## A.

Carter asserts that the district court erred in dismissing her hostile environment claim against Chrysler because she had made out a case under Title VII and Missouri law. Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

8

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such discrimination extends beyond terms and conditions in the "narrow contractual sense" and includes discriminatory harassment so severe or pervasive as to alter the conditions of employment and create a hostile working environment. See Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).[5]

To state a claim for hostile environment harassment by non-supervisory co-workers, Carter must establish: (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. See Quick v. Donaldson Co, Inc., 90 F.3d 1372, 1377 (8th Cir. 1996); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993); see also Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2267 (1998) (employer negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it).

There is no dispute that Carter is a member of protected classes or that she was subject to unwelcome harassment, but the parties disagree about whether the hostile acts directed at Carter were because of her race or gender. Chrysler and the union argue the offensive conduct resulted from her reporting another employee and her working up the line into Dickens' area. Carter argues that the derogatory language showing racial and gender animus points to the real source of the hostile acts and that there is other corroborating evidence in the record.

---

[5]Because the relevant provisions of the Missouri Human Rights Act are patterned after federal law and interpreted with federal precedent, Swyers v. Thermal Science, Inc., 887 S.W.2d 655, 656 (Mo. Ct. App. 1994), Carter's state claims need not be analyzed separately. See, e.g., Hennessey v. Good Earth Tools, Inc., 126 F.3d 1107, 1108 & n.2 (8th Cir. 1997); Smith v. St. Louis Univ., 109 F.3d 1261, 1264 n.2 (8th Cir. 1997).

Employees are entitled to a workplace free from "discriminatory intimidation, ridicule, and insult" motivated by the employees' membership in a protected class. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993); Meritor, 477 U.S. at 65; Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Although workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations," Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002 (1998), gender-based insults, including the term "bitch," may give rise to an inference of discrimination based on sex, see Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 964 (8th Cir. 1993); see also Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000-01 (10th Cir. 1996); 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 808 (3d ed. 1996) (citing cases).[6] Similarly, racial epithets are often the basis of racial harassment claims, see White v. Honeywell, Inc., 141 F.3d 1270, 1273 (8th Cir. 1998); Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 356 (8th Cir. 1997), and may likewise create an inference that racial animus motivated other conduct as well, see White, 141 F.3d at 1276; Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861-62 & n.8 (5th Cir. 1993); see also Gipson v. KAS Snacktime Co., 1999 WL 153038, at *5 (8th Cir. Mar. 12, 1999) (dictum).

All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. See Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1014 (8th Cir. 1988); see also Durham Life Ins. Co. v. Evans, 166 F.3d 131, 148-49 (3d Cir. 1999); Doe, 119 F.3d at 577-78; Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987); McKinney v. Dole, 765 F.2d 1129, 1138-

---

[6]Chrysler argues that Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 (7th Cir. 1999), supports its contention that Carter was not subjected to harassment because of her sex or race, but none of the evidence the Hardin court deemed admissible pointed to race or gender bias; the alleged conduct lacked race or gender overtones and all employees were subjected to verbal abuse. Id. at 345-46.

39 (D.C. Cir. 1985). Harassment alleged to be because of sex need not be explicitly sexual in nature. See Smith v. St. Louis Univ., 109 F.3d 1261, 1265 (8th Cir. 1997); Kopp, 13 F.3d at 269.

Carter produced evidence from which a factfinder could reasonably conclude that she experienced a hostile work environment motivated by her sex or race. Dickens continually used sexual and racial epithets in his taunting, and there was evidence that Duck also used sexual epithets towards her. Dickens explained his conduct towards Carter was caused by her clothes and her "putting her ass up in our faces." Someone wrote in the men's restroom that "Gloria sucks dick" and you can get something from her for one hundred dollars, and Carter was told about the graffiti.[7] Dickens and others persisted in reading Playboy within Carter's view, and a photograph of a naked man was placed at her work station.

Our review of the record indicates that the district court drew inferences in favor of the moving party, particularly with respect to motivation. The district court chose to believe that the motivation behind the behavior Carter found offensive was animosity towards a snitch. A factfinder might well draw that conclusion from the evidence, but the court's role on summary judgment is not to find facts or to construe inferences in favor of a moving party. Motive may need to be proved by the use of inferences so summary judgment may often not be an appropriate means for resolving this element. See Smith, 109 F.3d at 1266; see also Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). Here, Carter produced evidence to establish material issues of fact on whether or not the abusive conduct resulted from racial or gender

---

[7]Chrysler contends that Carter knew of the graffiti only through hearsay, but there is no dispute that she heard about its existence during the time in which she experienced harassment. It is thus relevant on whether a hostile environment existed and whether Carter reasonably perceived other conduct to be hostile or abusive. See Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir. 1997) (allowing evidence of racially derogatory comments made outside plaintiff's presence).

animus, and on this record it is for the factfinder to make a final determination. See Crawford, 37 F.3d at 1341.

Even if a plaintiff demonstrates discriminatory harassment, Title VII only reaches such conduct if it is severe or pervasive enough to alter the conditions of employment. The objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 118 S. Ct. at 2283 (citing Harris, 510 U.S. at 21-22). Sporadic or casual comments are unlikely to support a hostile environment claim. See Cram v. Lamson & Session Co., 49 F.3d 466, 474 (8th Cir. 1995); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (1981). The conduct must be looked at as a whole in addition to the individual comments or acts. "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" Hathaway, 132 F.3d at 1222 (quoting Burns, 955 F.2d at 564).

A number of factors are relevant in assessing the magnitude of harassment, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance, see Faragher, 118 S. Ct. at 2283; Harris, 510 U.S. at 23; Quick, 90 F.3d at 1378, physical proximity to the harasser, and the presence or absence of other people, see Hathaway, 132 F.3d at 1222-23. Harassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable. See Harris, 510 U.S. at 22.

Carter has produced evidence that she experienced a host of indignities over the course of some two years. She regularly suffered verbal abuse interlaced with sexual and racial epithets. Rude sexual gestures were frequently made towards her, sexual insults were written on the walls of the company restroom, and acts of vandalism occurred in her work area. A picture of a naked man, dead animals, threatening notes, foul-smelling material, and debris were directed at her area. This altered her daily work environment, and she has shown that this conduct caused

12

humiliation and intimidation, that it occurred in the presence of her co-workers, and that the source of much of the problem was someone who worked in very close proximity to her on the assembly line. We also find that it is not without significance that at least one of the Chrysler managers most involved in investigating her claims believed that she had been sexually harassed. Given this showing, Carter produced enough to avoid summary judgment because on such a record a factfinder could find the harassment sufficiently severe or pervasive to create liability under Title VII.

In order to succeed on her claims, Carter must also show that Chrysler knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment. See Bailey v. Runyon, 167 F.3d 466, 468 (8th Cir. 1999); Davis v. Tri-State Mack Distribs., Inc., 981 F.2d 340, 343 (8th Cir. 1992). The promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve. See Howard v. Burns Bros., Inc., 149 F.3d 835, 841 (8th Cir. 1998); Smith, 109 F.3d at 1265; Kopp, 13 F.3d at 270. Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, compare Bailey, 167 F.3d at 468-69 and Howard, 149 F.3d at 843-44, with Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir. 1984), the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, see Hathaway, 132 F.3d at 1224, and whether or not the measures ended the harassment, compare Zirpel v. Toshiba Am. Info. Sys., Inc., 111 F.3d 80, 81 (8th Cir. 1997), with Smith, 109 F.3d at 1265, Baty v. Willamette Indus., Inc., 1999 WL 191184, at *8 (10th Cir. Apr. 7, 1999), and Intlekofer v. Turnage, 973 F.2d 773, 779-80 (9th Cir. 1992).

There is evidence that Chrysler responded to Carter's complaints, but the issue is whether its response was adequate. Even though Chrysler officials met with her and Dickens immediately after her first complaint and cautioned him against future misbehavior, she asserts that the company did not follow up on its notice that Dickens was undeterred by the warning. She alleges that this pattern of ineffectual action

13

continued for at least a year and a half. In response to her ongoing complaints, supervisors would periodically tell Dickens to leave Carter alone; he would sometimes temporarily desist but then begin harassing her again. Chrysler and the union also undertook fuller investigations on several occasions, questioning Carter, her alleged harassers, and others working in the area. Dickens and others were warned that their jobs were at risk if they were found to have harassed Carter, but Carter says that they continued to behave offensively despite these warnings. The company terminated Dickens and Duck, and Carter concedes that Dickens stopped many offensive behaviors after his return to work, but she claims that Chrysler knew that he was harassing her in new ways. After Dickens' return, Chrysler officials, including Eugene Hatten, an investigator from Chrysler's Detroit Office of Workforce Diversity, met with Carter a number of times to discuss her situation. She states that Dickens continued to harass her into 1996, almost two years after his suspension, although supervisor reprimands had some effect in regard to the cardboard divider and the Playboy magazines. She also claims that Chrysler supervisors were sometimes dismissive or hostile to her complaints, and that the company talked about transferring her but never the offenders.

The district court found Carter's hostile environment claims against Chrysler deficient on other grounds and dismissed them without analyzing the record on the issue of the adequacy of Chrysler's response to her complaints. The record needs to be reviewed as to what it shows about the sequence of complaints by Carter and the promptness and effectiveness of Chrysler's responses. Relevant factors include the information made known to Chrysler, the nature of the alleged harassment and its extent, available options for remedial action, and whether Chrysler's response was reasonably calculated to end the harassment. The district court should consider this issue on remand in order to determine whether or not factual disputes also preclude summary judgment on this final element of Carter's hostile environment claims.

B.

14

Carter also appeals the dismissal of her claims against the union. She expressly disavows any claim based on the union's duty of fair representation, but claims that the union's response to her harassment complaints violated Title VII. She has not made clear the factual basis for this allegation or the legal argument for union liability.

Labor organizations have a duty to refrain from discrimination on the basis of race or sex. See 42 U.S.C. § 2000e-2(c)(1); Mo. Rev. Stat. 213.055(2). Unions are also liable under Title VII if they cause or attempt to cause an employer to discriminate,[8] see 42 U.S.C. § 2000e-2(c)(3); a union may be liable on this basis if it prevents an employer from fulfilling its statutory responsibilities. See Hardison v. Trans World Airlines, Inc., 527 F.2d 33, 42-43 (8th Cir.1975), rev'd on other grounds, 432 U.S. 63 (1977) (union "may be held liable if it purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer so as to cause the employer to discriminate [on the basis of religion]").

Carter's brief asserts that the union "took no steps to investigate [her] claims of harassment," but there is uncontroverted evidence in the record that union officials were very much involved in investigating her claims. She also criticizes the union's handling of her complaints, but she never asked it to file a formal grievance on her behalf. Nor has she presented evidence to show that the union refused to file a grievance it thought had merit or that it acted to prevent Chrysler from remedying the situation.[9]

---

[8]The portions of the Missouri Human Rights Act which address unions are comparable to Title VII, except that the state statute does not include language making unions liable for causing or attempting to cause discrimination by the employer. Since the coverage of Title VII is broader, we need not discuss the state law separately.

[9]For the first time on appeal she argues that the union's successful prosecution of grievances on behalf of Dickens and Duck supports union liability,

Carter has not produced evidence to show that the union dealt with her in a discriminatory manner or that it prevented Chrysler from fulfilling any obligations to her. Unlike the facts of Marquart v. Lodge 837, Int'l Ass'n of Machinists, 26 F.3d 842 (8th Cir. 1994), upon which she relies, there is no evidence of discriminatory animus on the part of the union. Because she did not meet her burden of production, the union was entitled to summary judgment.

## C.

The judgment of the district court is affirmed in respect to the dismissal of Carter's claims for retaliation and against the union, but it is reversed in respect to the hostile work environment claims against Chrysler because there are material issues of fact in the record on the nature and extent of any abusive conduct and on causation. The discrimination claims against Chrysler are remanded for further proceedings consistent with this opinion, including consideration of whether or not there are material issues of fact on the question of prompt and effective remedial action on the part of Chrysler.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

but this argument was not raised in the district court and need not be considered now. See United States v. Molina, Nos. 98-1432, 98-1433, 98-1434, slip op. at 11 (8th Cir. Apr. 12, 1999); Curtis v. Elecs. & Space Corp., 113 F.3d 1498, 1503 n.2 (8th Cir. 1997); Anderson v. Unisys Corp., 47 F.3d 302, 307 n.14 (8th Cir. 1995).

16