# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4308

_____

| | | |
|---|---|---|
| Jaye B. Clearwater, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Independent School District | * | of Minnesota. |
| Number 166, an employer and | * | |
| political subdivision in the State | * | |
| of Minnesota; Donald Langan, | * | |
| in his individual and his official | * | |
| capacity, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: October 18, 2000
Filed: November 20, 2000

_____

Before MURPHY, HEANEY, and BYE, Circuit Judges.

_____

MURPHY, Circuit Judge.

Jaye Clearwater sued Independent School District Number 166 and Donald Langan, its former superintendent,  for race discrimination, sex discrimination, sexual harassment, retaliation, and violation of the Minnesota Government Data Practices

Act and the Minnesota Open Meeting Law. The district court[1] granted summary judgment in favor of defendants on her federal and state claims of race and gender discrimination, sexual harassment, and retaliation, and it dismissed her Government Data Practices Act and Open Meeting Law claims without prejudice. Clearwater appeals only the dismissal of her claims for discriminatory discharge on the basis of race and for a gender-based hostile work environment.[2] We affirm.

I.

Appellant Jaye Clearwater is a member of the Onondaga Nation of Indigenous Peoples. She was employed as a teacher at Sawtooth Elementary School in Cook County, Minnesota from 1981 until her forced resignation in January 1995. It is undisputed that Clearwater was a competent and effective educator and that she had no disciplinary infractions in her personnel file until the 1992-93 school year. Beginning in 1993, however, Clearwater began to arrive at school after 8:00 a.m. and was cited by Sawtooth principal Gail Becker for her tardiness.

The collective bargaining agreement between the teachers union and the school district provided that "teachers will be in their areas of responsibility before students arrive and stay until students leave." The parties agree that students usually began to arrive around 8 a.m. every day. Becker met with Clearwater in early March and said that her habitual tardiness was unacceptable and that she was receiving a verbal

---

[1] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2] Her race discrimination claim was brought under 42 U.S.C. § 2000e et seq. (Title VII), 42 U.S.C. § 1981, and the Minnesota Human Rights Act (MHRA). Her hostile work environment claim is based on Title VII and the MHRA. We review these state and federal claims under the same standards. See Breeding v. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999).

warning. Becker sent Clearwater a letter on April 1 indicating that the tardiness problem had not been alleviated. A week later, Becker wrote to Clearwater again, noting that she had arrived late twice that week. She advised that any further incidents of tardiness would result in either a five day suspension without pay or recommendation for immediate dismissal.

Clearwater estimates that she was late on approximately five other occasions after receiving Becker's April 1 letter.[3] On May 10, 1993, the school district sent Clearwater a memorandum indicating that Becker and Superintendent Langan had met with her union representative. The memorandum stated that although the district had decided not to suspend or dismiss Clearwater at that time, it would recommend her dismissal if there were any further incidents of tardiness.

More late arrivals followed, and Langan suspended Clearwater in late May for five days and notified her that any more incidents of tardiness would result in termination. Clearwater then filed two grievances against the school district, and Langan scheduled a lunch meeting to discuss them. According to Clearwater, Langan did not discuss the grievances until the end of the meal, when he suggested that the two of them "make an evening out of this." Clearwater declined the invitation and stated in her deposition that she had felt "awkward" and "uncomfortable" about it, but that Langan had not made any lewd or offensive remarks, or implied that she was obligated to go out with him or that she would face negative career repercussions if she declined. According to Clearwater, Langan denied her grievances later that afternoon.[4] She did

---

[3]The district and Langan have submitted documentation that Clearwater arrived in her classroom after 8:00 a.m. on nearly thirty occasions after receiving her April 1 reprimand from Becker. Clearwater claims that she was not late on all of these occasions, but she did not present any evidence to counter the documentation.

[4]The district says that Clearwater voluntarily dropped the grievances in exchange for being permitted to remain at Sawtooth, but we accept her version for purposes of

not report the incident to any district representatives.

During the summer of 1993, Becker recommended to Langan that the district either transfer Clearwater to Grand Portage Elementary, a predominately Native American school close to her residence, or immediately terminate her. Clearwater preferred staying at Sawtooth, and Langan told her that she could remain if she dropped her two grievances and made a specific commitment to arrive at school on time. Clearwater agreed to those terms.

In spite of this agreement, Clearwater arrived late to a faculty workshop at the beginning of the 1993-94 school year.[5] Other incidents of tardiness followed. In response, the school board scheduled two pre-termination hearings in November and January. Both were canceled after the union negotiated on Clearwater's behalf. In March 1994, she signed an agreement with the district which specified required arrival times and automatic pay deductions for being late. She agreed that her employment would be immediately terminated upon six late arrivals. The district adequately documented seven late arrivals, and Langan sent Clearwater a notice of intent to terminate her employment.

Yet another agreement followed. At the beginning of the 1994-95 school year, the district agreed to suspend termination proceedings under a "last chance" agreement negotiated by her attorney. Clearwater agreed to arrive in her classroom by 8:00 a.m., to confirm her arrival by punching a time clock, and to resign voluntarily or consent to termination without a hearing if she was late more than five times. The agreement provided that a mutually agreed-upon, neutral arbitrator would verify Clearwater's

summary judgment.

[5]Clearwater acknowledges that she was late to the workshop, but alleges that three white teachers were also late but not punished. She has not provided any evidence that these teachers had a similar history of tardiness, however.

arrival times.  This neutral arbitrator later verified six late arrivals, and the district asked for Clearwater's resignation on the grounds that she had violated the terms of the last chance agreement.[6]  Clearwater then presented her resignation to the school board at its January 9, 1995 meeting.

Clearwater alleges that Langan made several remarks which disparaged her Native American heritage while he was superintendent.  She contends that during a meeting to discuss her punctuality problems, he advised her to "pitch her tent" across the street so as to avoid being late to school.  She also states that during their June 1993 lunch meeting, Langan related an anecdote about a Native American student who slept in the locker room so that he wouldn't be late for football practice.  He also said that he had once visited a ranch owned by Native Americans and had been surprised to see well-bred horses instead of "scrub Indian ponies."  Clearwater contends that after her forced resignation, Langan told her that she was "a big girl" who would know how to file for unemployment compensation.  Finally, she states that at some unspecified point during Langan's tenure the school district circulated a memorandum to several female teachers, but not to male teachers, proposing a policy against using personal sick leave to care for ill children.  Clearwater and several other female teachers challenged the proposal, and the district decided not to implement it after it was pointed out that it directly contravened the collective bargaining agreement.

Clearwater filed a charge of discrimination with the Equal Employment Opportunity Commission and the Minnesota Department of Human Rights.  She received her right to sue letter from the EEOC in August 1996, and filed this action in April 1997.  The district court granted summary judgment on her claims for race and

---

[6]Clearwater disagrees with the neutral arbitrator's findings.  She only acknowledges being late twice after signing the "last chance" agreement and maintains that on both of these occasions she punched in at 8:02 a.m.  She contends that on the other four occasions, she either forgot to punch in or should have been excused for medical or classroom preparation reasons.

gender discrimination, retaliation and sexual harassment, and declined to exercise its supplemental jurisdiction, dismissing her other state claims without prejudice. In this appeal, Clearwater asserts that the district court erred in granting summary judgment on her claims for racially discriminatory discharge and gender-based hostile work environment.

## II.

Our review of summary judgment is de novo. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999). Summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

Clearwater states that she has established both direct and indirect evidence of racially discriminatory animus leading to her termination. Proof by direct evidence requires evidence that the actual motive behind the termination of her employment was discriminatory animus. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Fast v. Southern Union Co., 149 F.3d 885, 890 (8th Cir. 1998). Stray remarks "are not sufficient to establish a claim of discrimination." Price Waterhouse v. Hopkins, 490 U.S. 228, 277.

Clearwater presented no direct evidence to suggest that Langan was motivated by racial animus in his dealings with her. Although Langan made remarks that Clearwater felt showed racial animus, they are not enough in themselves to show a

discriminatory motive in her termination. Clearwater contends that Langan's remarks about pitching a tent, "scrub Indian ponies," and the Native American student who slept in the locker room constitute direct evidence of racial discrimination. These remarks are not "sufficiently related to the adverse employment action in question" to constitute direct evidence of a discriminatory motive. Simmons v. Oce-USA, Inc., 174 F.3d 913, 915 (8th Cir. 1999). The record indicates that Langan gave Clearwater numerous opportunities to rectify her behavior so that she could remain at Sawtooth. Instead of following Principal Becker's advice in June 1993 that he either fire or transfer Clearwater, Langan permitted her to remain on staff at Sawtooth. Clearwater finally left employment in the district after she had agreed to be bound by a neutral factfinder and a process with clear consequences if she did not end her tardiness. The district and her supervisors tried to work matters out with her over a two year period, and the stray remarks by Langan are not enough to show a racial motive in her termination.

Clearwater also did not establish indirect evidence of unlawful race discrimination under the burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 890 (1973). For a prima facie case she had to demonstrate: (1) that she was within a protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that members of other racial groups were treated more favorably. See Breeding, 164 F.3d at 1156. She did not establish the fourth element since she merely stated her belief that white teachers "were equally as failing" as she in punctuality. She presented no evidence indicating when any other teachers were late, how often they were late, what time they arrived in their classroom, or whether the district or Langan were aware of any late arrivals. Clearwater's unsubstantiated allegations are insufficient to withstand summary judgment.

Most significantly, Clearwater has not demonstrated that the defendant's stated reason for firing her is pretextual. See Breeding, 164 F.3d at 1157. Clearwater failed to comply with the district's requirement that all teachers be present in their classrooms

when their students arrived at school, thereby leaving her students unattended and unsupervised on a number of occasions. Her late arrivals over a period of more than two years are numerous and well-documented. Clearwater presents no evidence to suggest that the stated reason for her termination was pretextual. The record is replete with evidence that the defendants regarded Clearwater as an effective educator and provided her with numerous opportunities to rectify her behavior. They suspended termination proceedings on at least three occasions and negotiated several individual agreements with her in the hope that she would resolve her tardiness problem and remain on staff at Sawtooth. As the district court noted, the school district provided Clearwater "with at least one verbal warning, three written warnings, a suspension, and two notices of pre-termination hearings as well as negotiating at least three separate agreements permitting [her] to remain in her position before it finally asked for her resignation." Even if she was not tardy on every cited occasion, she acknowledges that she was late at least five times after receiving her first two written reprimands from Principal Becker and that she was late at least twice after signing the "last chance" agreement, which had been negotiated by her attorney and under which she agreed to adhere to the determinations of the mutually selected neutral arbitrator. No "trialworthy issue of pretext" exists as to her race discrimination claim. Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779 (8th Cir. 1995).

B.

Clearwater also contends that the district court erred in dismissing her claim of a gender-based hostile work environment. On this claim Clearwater had to establish: (1) membership in a protected group; (2) unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take

prompt and remedial action.[7]  Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).  In determining whether the alleged harassment is actionable, the totality of the circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 787.  "More than a few isolated incidents are required."  Meritor Savs. Bank v. Vinson, 477 U.S. 57, 67(1986).

Clearwater maintains that she was subject to the following harassing conduct: (1) the school district circulated a memorandum delineating a proposed sick leave policy to several female teachers, but no male teachers; (2) Langan asked her to join him for dinner and his invitation was unwelcome; (3) after her resignation Langan told her that she was "a big girl" who should know how to file for unemployment compensation.[8]  This conduct was not so "extreme" that it "amount[ed] to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Id. at 787.

Clearwater has not put forward sufficient evidence to establish a gender-based hostile work environment.  The proposed sick leave policy was never implemented, and Langan's statement that Clearwater was "a big girl" was made only after her resignation.  Although Clearwater testified that Langan's dinner invitation made her feel

---

[7]An employer may be vicariously liable for a supervisor's sexual harassment, but in this case we need not reach that issue.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).

[8]Clearwater also claims that Langan referred to other female employees as "the sweet," "little homemaker," "a size three," and "Susie Q."  She admits that she herself never heard these comments and she has not shown the context in which they were made or that they had any impact on her.

uncomfortable, that isolated invitation is not enough to make out a hostile work environment. Accordingly, the district court did not err in granting summary judgment on this claim.

## III.

The record does not reflect how many Native American teachers there are in Cook County, Minnesota, and it is unfortunate that an able educator like Jaye Clearwater was unable to conform to all the school district's requirements. While her departure may be regretted, our task is to judge only whether she has made out her claims of racially discriminatory discharge or gender-based hostile work environment. After studying the record, we conclude that the district court did not err in granting summary judgment and accordingly affirm the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.