# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————————

No. 01-2487

———————————

| | | |
|---|---|---|
| Jason Shade, individually; | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| City of Farmington, Minnesota, a | * | |
| Minnesota Municipal Corporation; | * | Appeal from the United States |
| Ted Dau, individually and in his | * | District Court for the |
| official capacity, | * | District of Minnesota. |
| | * | |
| Appellees. | * | |

———————————

Submitted: March 15, 2002
Filed: November 6, 2002

———————————

Before HANSEN, Chief Judge, JOHN R. GIBSON, Circuit Judge, and GOLDBERG,[1] Judge.

———————————

HANSEN, Circuit Judge.

---

[1]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

Jason Shade (Shade) brought this 42 U.S.C. § 1983 action, alleging that his constitutional right to be free from an unreasonable search and seizure was violated by school officials and police officers. He also sought attorneys fees and costs for alleged violations of the Minnesota Government Data Practices Act (Data Practices Act), Minn. Stat. §§ 13.01-13.99. The district court[2] ruled on summary judgment that police officer Ted Dau was entitled to qualified immunity for his role in the search and that Shade was not entitled to attorney's fees and costs under the Data Practices Act. Shade appeals, and we affirm.

I.

At the time of the search in question, Shade was a 17-year-old student at the Apple Valley Alternative Learning Center (Apple Valley ALC), located in Apple Valley, Minnesota. On December 2, 1999, Shade's teacher, Allen Schmitz, transported Shade and seven other students by bus from Apple Valley ALC to Al's Autobody, a local business in the neighboring community of Farmington, Minnesota, for automotive shop class. Along the way, Mr. Schmitz stopped the bus at a local fast-food restaurant to allow the students to purchase breakfast. Shade bought a breakfast sandwich and a container of orange juice.

Once the students and Mr. Schmitz were back on the bus and on their way again, Shade asked whether any student around him had something he could use to open his container of orange juice. Brandon Haugen, a student sitting nearby, offered Shade his folding knife. Shade took the knife, unfolded the blade, and used it to open the orange juice. Shade then closed the blade and handed the knife back to Haugen. Through the review mirror, Mr. Schmitz had observed Shade using the folding knife but had not seen where the knife came from or where it went after Shade had used it.

_____

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

2

When Mr. Schmitz arrived at Al's Autobody with the students, he contacted Shirley Gilmore, a coordinator at Apple Valley ALC, and told her that he had seen Shade with a knife on the bus. Ms. Gilmore then contacted Dan Kaler, the principal for the alternative school, and they decided that the automotive shop students should be searched before returning to the alternative school because possession of a knife violated the school district's rule prohibiting weapons and presented an immediate safety concern.[3] While the students were still in class in Farmington, Principal Kaler contacted the Apple Valley school liaison officer, Michael Eliason, to assist in searching the students. Ms. Gilmore, in turn, relayed a message to Mr. Schmitz that the students were to be detained at Al's Autobody until school officials were able to arrive at the shop to investigate the matter. Officer Eliason contacted his fellow school liaison officer, Officer Ted Dau, at the Farmington high school, to obtain Dau's assistance in searching the students.

Officer Dau, Officer Eliason, and Ms. Gilmore met at a location near Al's Autobody and proceeded to the bus as the students were boarding to return to Apple Valley ALC. Mr. Schmitz informed Officer Dau that he had seen Shade with a "medium-sized knife." (Appellant's App. at 127.) When Officer Dau asked whether any of the other students possessed knives, Mr. Schmitz responded that he did not know.

The officers then asked the students to exit the bus, which they searched but did not find a knife. After the students had exited, Officer Dau informed the students that each of them would be searched to locate the knife that Mr. Schmitz had seen. When Officer Dau asked if any student had a knife to turn over before the officers

---

[3]School policy bans the possession of any "weapon or look-alike weapons," which is defined in relevant part as "[p]ossessing . . . any device or instrument designed as a weapon and capable of producing severe bodily harm, or intended to look like a device or instrument capable of producing severe bodily harm." (Appellant's App. at 24.)

began their search, Haugen stepped forward and handed a knife to Officer Eliason. Officer Dau thereafter directed the students to place their hands on the bus and spread their legs. Dau conducted a pat-down search of the male students, and Ms. Gilmore searched the two female students in the group.

When Officer Dau searched Shade, he found no knife but did find an item similar in appearance to an ASP tactical baton in Shade's front pocket. An ASP tactical baton is often carried by law enforcement officers for use in neutralizing and controlling aggressive individuals. The item Shade possessed was nine and a half inches long but expanded to more than twenty-two inches. Unlike an actual baton, a portion of its shaft consisted of a sturdy but flexible spring. Based on his possession of the knife on the bus, Shade was charged with possessing a dangerous weapon on school property, in violation of Minn. Stat. § 609.66, subd. 1d(a). The school also initiated an expulsion proceeding against Shade on the basis that his possession of the knife and the expandable device violated the school's ban on weapons.

Shade and his parents contested the disciplinary action. They argued that the expandable device was merely a "pointer" that Shade had intended to use in class, which he also used in his family's home business. Shade's father also sought the officer reports prepared after the search for use in defending against the expulsion proceeding. The departments involved, however, declined to provide the information. As a result, Shade filed suit in Minnesota state court, claiming that he was entitled to the reports under the Data Practices Act.[4] A Minnesota district judge agreed and ordered the departments to provide the information that Shade sought.

---

[4]The initial suit was filed by Shade's parents on his behalf. He has since turned eighteen.

Shade subsequently amended his complaint to allege that Officer Dau and the City of Farmington violated his civil rights by conducting an unreasonable search.[5] Shade also sought costs and attorney's fees incurred in his efforts to obtain the police records. The defendants removed the case to federal court and moved for summary judgment. The district court ruled that Officer Dau was entitled to qualified immunity for his role in the search and that Shade had pointed to no facts supporting a claim of municipal liability against the City of Farmington. The court also recognized that the Minnesota state court had ordered the City to disclose the reports pursuant to the Data Practices Act but concluded that Shade was not entitled to fees and costs.

## II.

Shade challenges the district court's grant of qualified immunity to Officer Dau for his role in the search, a decision we review de novo.[6] Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000). A state actor is entitled to qualified immunity when his "'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity is appropriate, we first ask whether the plaintiff alleges facts demonstrating that the state actor violated the plaintiff's constitutional or statutory rights. See Hope v. Pelzer, 122 S.

---

[5]The complaint alleged similar violations against other defendants, but those claims were resolved by the parties. Shade and the school resolved the disciplinary matter, and Shade served a short suspension from school for the weapons violation. As for the criminal charge, Shade offered a plea of guilty that the juvenile court refused on the condition that Shade complete a satisfactory six-month probationary period.

[6]Shade has not briefed the merits of his civil rights claim against the City of Farmington. We therefore consider Shade's appeal abandoned as to that claim. See Carter v. Chrysler Corp., 173 F.3d 693, 699 (8th Cir. 1999).

5

Ct. 2508, 2513 (2002); Washington v. Normandy Fire Prot. Dist., 272 F.3d 522, 526 (8th Cir. 2001). In doing so at the summary judgment stage, we "take as true those facts asserted by [a] plaintiff that are properly supported in the record." Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001). If those facts would establish a constitutional violation if proven at trial, our next inquiry is whether the right violated was clearly established at the time of the state actor's conduct. Washington, 272 F.3d at 526. The law is clearly established if the law was sufficiently developed to give the official "fair warning" that his alleged conduct violated the plaintiff's rights. Hope, 122 S. Ct. at 2516.

A.

In defining whether the summary judgment facts demonstrate a constitutional violation, we face the task of determining what Fourth Amendment standard governs the lawfulness of Officer Dau's conduct. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls, 122 S. Ct. 2559, 2564 (2002) (internal quotations omitted). As a general rule, the reasonableness requirement obligates law enforcement officers to obtain a judicial warrant, issued only on a showing of probable cause, before conducting a search. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989). Even in those situations where the Court has found it permissible for officers to conduct a search without a warrant, an officer may, as a general rule, search an individual only when there is "probable cause to believe that the person to be searched has violated the law." Id. at 624.

But neither the warrant nor the probable cause requirement is a constitutional prerequisite to a valid search when the government has "special needs" beyond normal law enforcement that render the requirements impracticable. Id. at 619. On three separate occasions, the Supreme Court has recognized that "special needs" exist

6

in the public school setting, thereby permitting school officials to search a student without a warrant and without probable cause to believe that the student violated the law. See Earls, 122 S. Ct. at 2569 (upholding the constitutionality of school's policy to randomly drug test students participating in extracurricular activities); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 664-65 (1995) (rejecting Fourth Amendment challenge to random drug testing of student-athletes); New Jersey v. T.L.O., 469 U.S. 325, 340-41 (1985) (concluding that the probable cause and warrant requirements are unsuited to the public-school setting). These three decisions teach that students retain a privacy interest while at school but explain that the probable cause and warrant requirements are ill-suited in the school setting because the requirements would overbear school administrators' and teachers' ability to maintain order and insure an environment conducive to learning. The Fourth Amendment's reasonableness inquiry, therefore, must account for "the schools' custodial and tutelary responsibility" over the students entrusted to their care. Vernonia, 515 U.S. at 656.

In T.L.O., a case involving a school official's decision to search an individual student based on a belief that the student violated a school rule, the Supreme Court accounted for the school's interest in an orderly learning environment by adopting a two-part "reasonableness" inquiry. 469 U.S. at 341. In such a case, the Court explained that the lawfulness of the search first depends on whether the official's search was "justified at its inception." Id. (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). If so, the second inquiry is whether the search was reasonable in scope. Id. Subsequently, in the context of suspicionless drug testing, the Court has employed a three-factor balancing approach to assess the reasonableness of a school's drug-testing policy that implicates Fourth Amendment concerns. Despite the intervening two cases, we conclude that T.L.O.'s two-part inquiry remains the appropriate standard governing the search of an individual student based on a perceived rule violation. T.L.O. specifically dealt with such a situation, whereas the special needs addressed in the context of school drug testing are quite different. See In re Angelia

7

D.B., 564 N.W.2d 682, 688 (Wis. 1997) (applying T.L.O. in a similar case after Vernonia).

The question remains whether T.L.O.'s standard applies when, as here, law enforcement officers were involved in searching a student and the search occurred away from traditional school grounds. Neither of these considerations has been before the Supreme Court in its prior school-search cases. In T.L.O., the Court explicitly refrained from expressing a judgment on the nature of the Fourth Amendment review when a search is "conducted by school officials in conjunction with or at the behest of law enforcement agencies." 469 U.S. at 341 n.7. Not long after the T.L.O. decision, our court held that T.L.O.'s reasonableness standard, not probable cause, applied when a school official searched a student in conjunction with a school liaison officer. See Cason v. Cook, 810 F.2d 188, 193 (8th Cir.), cert. denied, 482 U.S. 930 (1987). We relied on the fact that the school official made the initial decision to investigate the student and conducted most of the actual investigation. Id. at 192-93. We also noted that the officer's involvement was limited to conducting a pat-down search of the student after the school official located a stolen item in the student's purse. Id. at 193. Most courts addressing law enforcement involvement after Cason have similarly concluded that T.L.O.'s reasonableness standard applies when school officials initiate the search or when the officers are only minimally involved in the search. In re Angelia D.B., 564 N.W.2d at 687 (collecting cases).

As in Cason, school officials, not law enforcement officers, initiated the investigation and the search of Shade and the other students. Ms. Gilmore and Principal Kaler decided to search Shade and the others because they felt the knife presented a safety concern, requiring swift action and the assistance of trained law enforcement officers. The two school officials reasonably believed that a police officer was more capable and better trained to search for a weapon in a student's possession and decided to detain the students at Al's Autobody to eliminate the

8

concern as quickly as possible.  See In re Josue T., 989 P.2d 431, 437 (N.M. Ct. App. 1999) (concluding the T.L.O. standard applied when school officials sought officer's assistance after determining a student's possession of a weapon presented a safety issue).  Ms. Gilmore also directed the officers to search the students when she arrived at the automotive shop.

In comparison to the officer's involvement in Cason, Officer Dau and Officer Eliason played a more substantial role in the investigation and search, but the extent of their involvement does not distinguish this case from Cason.  The school official in Cason suspected that the student was in possession of items stolen from other students' lockers, not that she was in possession of a dangerous weapon.  Because Shade was seen with a knife, it was entirely reasonable for Officer Dau and Officer Eliason to play a greater role in questioning those involved and in directing the mechanics of the search.  As the Supreme Court of Wisconsin wisely explained, a contrary conclusion "might serve to encourage teachers and school officials, who generally are untrained in proper pat down procedures or in neutralizing dangerous weapons, to conduct a search of a student suspected of carrying a dangerous weapon on school grounds without the assistance of a school liaison officer or other law enforcement official[s]."  In re Angelia D.B., 564 N.W.2d at 690.

The fact that the search occurred away from what one would consider traditional school grounds similarly does not elevate the Fourth Amendment standard to one of probable cause.  The nature of administrators' and teachers' responsibilities for the students entrusted to their care, not school boundary lines, renders the Fourth Amendment standard in the public-school context less onerous.  Here, because of the unique and practical nature of their alternative-school education, the students were receiving training outside of a typical classroom away from the school. However, Mr. Schmitz, Ms. Gilmore, and Principal Kaler – the school decision-makers – still had the same obligation to protect the alternative students from harm and insure a conducive learning environment despite the off-campus setting.  Moreover, the

students were at all times in the custody and control of their teacher when the events occurred. See Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1079-80 (5th Cir.) (applying T.L.O.'s inquiry to school officials' physical detention of a student during a school field trip), cert. denied, 516 U.S. 995 (1995). Because school officials initiated the investigation and search of Shade in furtherance of the school's interest in maintaining a safe learning environment, and because they asked officers to assist them in furtherance of that interest, we hold that T.L.O.'s two-part inquiry governs the lawfulness of the search conducted by Officer Dau.

B.

Under T.L.O., a search is "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." T.L.O., 469 U.S. at 342. Shade argues that reasonable grounds to search him did not exist because Haugen had already turned over the knife at the time when Officer Dau searched him. Although Officer Dau did not know the knife Haugen turned over was the same one Mr. Schmitz had seen, Shade contends that Officer Dau should have asked Mr. Schmitz whether the knife Haugen handed over was the same one Mr. Schmitz had seen on the bus. In furtherance of the argument, Shade points out that Mr. Schmitz confirmed that Haugen's knife was the one Mr. Schmitz had seen in Shade's possession after the search of the students was complete.

Accepting Shade's argument would require us to undertake the type of "Monday morning quarterbacking" that is prohibited under the Fourth Amendment. See Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995). The Fourth Amendment does not require officers to use the least intrusive or less intrusive means to effectuate a search but instead permits a range of objectively reasonable conduct. See id. If the officers' conduct falls within that permissible range of reasonableness, it is not our role to hinder or interfere with the difficult tasks and emotionally-charged situations

that officers face in their daily job.  See generally Gardner v. Buerger, 82 F.3d 248, 252 (8th Cir. 1996) ("Police officers have tough jobs, and the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving."  (internal quotations omitted)).

In the instant case, Officer Dau's conduct fell within the range of reasonable conduct permitted under the Fourth Amendment.  Mr. Schmitz told Officer Dau that he had seen Shade, not Haugen, with a medium-sized knife, in violation of the school's ban on weapons.  Thus, when Haugen turned over a knife to Officer Eliason, all Officer Dau knew was that a student, one who had not been seen with a knife, had volunteered a contraband item.  Officer Dau testified at his deposition that he was unable to see the knife when Haugen presented it to Officer Eliason.  As a consequence, he did not know whether the knife handed over fit the generic description of the knife that Mr. Schmitz had offered earlier, nor did Mr. Schmitz inform Officer Dau that Haugen's knife was the one he had seen.  In fact, Mr. Schmitz believed there might have been more than one knife after Haugen offered one.  Given these facts, Officer Dau continued to have reasonable grounds to believe that Shade might have been in possession of a knife, even though Haugen had volunteered one.[7] See Thompson v. Carthage Sch. Dist., 87 F.3d 979, 983 (8th Cir. 1996) ("[I]t is not realistic to require [school officials] to abort the search of a particular child who does not appear to be in possession of . . . contraband" once the officials "decide[] to quickly search many children's pockets for dangerous weapons.").  While Shade's suggestion that Officer Dau should have asked more questions once a knife was

_____

[7]We express no opinion on whether the search of the other students was permissible under the Fourth Amendment because Shade lacks standing to complain of their treatment.  See Rozman v. City of Columbia Heights, 268 F.3d 588, 591 (8th Cir. 2001) (en banc) (holding that landlord lacked standing to assert constitutional claims of his tenants), cert. denied, 122 S. Ct. 1438 (2002).

turned over is a plausible one, "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." Earls, 122 S. Ct. at 2569 (internal quotations omitted).

Having concluded the search was justified, we have little trouble deciding that it also was reasonable in scope. A search is reasonable in scope if the "measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." T.L.O., 469 U.S. at 342. Applying this standard, we previously have held in Thompson v. Carthage Sch. Dist. that officials may pat down and search a student's pockets when looking for a dangerous weapon, which is the action Officer Dau employed here. 87 F.3d at 983. Finding no evidence to support a conclusion that Officer Dau's search of Shade was unreasonable under the circumstances, we conclude that Shade has not established a violation of his Fourth Amendment rights. Our qualified immunity inquiry is therefore at an end, and we agree with the district court that Officer Dau is entitled to immunity for his role in the search.

## III.

We turn next to Shade's claim for attorney's fees and costs under Minnesota law. An individual may request and obtain access to all data that is designated as "public government data" under the Data Practices Act. Minn. Stat. § 13.03, subd. 3(a). Information is presumed to be public government data unless it is classified as nonpublic or confidential by state or federal law or other proper procedures. Id., subd. 1. Section 13.82 of the Act governs the classification of information gathered and reports maintained by law enforcement officials in Minnesota. The section specifies what information is considered public data and carves out other types of information in the possession of law enforcement that are designated as confidential or nonpublic data.

12

When access to public data is denied, an "aggrieved person" may bring a civil action to obtain access to the wrongfully withheld information, and attorney's fees and costs are recoverable in such an action. See Minn. Stat. § 13.08, subd. 4. An "aggrieved person" is one who is denied "access to data that is available as a matter of right" under the act. Wiegel v. City of St. Paul, 639 N.W.2d 378, 384 (Minn. 2002). The act also permits discovery of nonpublic information when a judicial officer determines a party's need for the information is outweighed by the need to keep the information confidential. Id. § 13.03, subd. 6. Contrasting these two procedures, the Supreme Court of Minnesota recently explained in Wiegel that "it is important to note that sometimes a person can prevail in a legal action by obtaining access to data, but not be aggrieved by the government's action because the data were not available to the person as a matter of right." Id.

Like the district court, we are unable to ascertain whether the state court ordered the disclosure of nonpublic data or the disclosure of wrongfully withheld public data. Its order does not specify or classify the information Shade sought. From the limited record before us on the issue, it appears the information sought from the Farmington police department would be classified as reports involving the ongoing criminal investigation of several juveniles found to be in possession of contraband. (The officers found multiple students to be in possession of contraband items.) Records involving such matters are confidential. See Minn. Stat. § 13.82, subd. 7 (declaring information confidential when it is part of a pending investigation relating to a purported offense); id., subd. 6(g) & 17(g) (permitting agencies to protect the identities of juvenile witnesses); § 260B.171, subd. 5 (prohibiting disclosure of records concerning juveniles, except to the child's parents or guardian). We therefore affirm the district court's conclusion that Shade is not an "aggrieved person" entitled to attorney's fees and costs under § 13.08.

13

IV.

We affirm the judgment of the district court in its entirety.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent.   I share the concerns the district judge articulated that a simple question to teacher/driver Schmitz would have rendered unnecessary the search of either Jason Shade or the other seven passengers on the bus.  Schmitz later stated that the knife produced and turned over by Brandon Haugen to the police was the same knife that he saw through the rear view mirror in Jason Shade's hand, being used to open a can of orange juice.   This simple question and this answer render the search unreasonable and not justified at its inception.  I would reverse.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.